# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR DUANE JACKSON, et al., | Case No. 1:13-cv-01055-LJO-SAB |
| Plaintiffs, | FINDINGS AND RECOMMENDATIONS RECOMMENDING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |
| v. | |
| STATE OF CALIFORNIA, et al., | (ECF Nos. 44, 56, 58) |
| Defendants. | OBJECTIONS DUE WITHIN FOURTEEN DAYS |

## I.

## PROCEDURAL HISTORY

Plaintiffs Arthur Duane Jackson, Leonard M. Lujan, Marcus Jackson, Rodney Taylor, Lacedric Johnson, L.T. Belton, and Norman Johnson filed this civil rights action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1981 on July 9, 2013. (ECF No. 1.) Plaintiffs bring this action against Defendants Edmund G. Brown, Jr., Matthew Cate, Jeffrey Beard, P.D. Brazelton, and James D. Hartley for deliberate indifference in violation of the Eighth Amendment, racial discrimination in violation of the Fourteenth Amendment and 42 U.S.C. § 1981, and against the individual defendants and Defendants State of California, California Department of Corrections and Rehabilitation ("CDCR"), and Pleasant Valley State prison for negligence under state law. Plaintiffs are seeking monetary damages and declaratory and injunctive relief.

Defendants filed a motion to dismiss on September 25, 2013. (ECF No. 15.) Plaintiffs

1 filed a first amended complaint on October 16, 2013. (ECF No. 16.) On October 18, 2013, an order issued denying Defendants' motion to dismiss as moot. (ECF No. 24.)

On November 4, 2013, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (ECF No. 25.) Plaintiffs filed an opposition to the motion and request for judicial notice on January 22, 2014. (ECF No. 32, 33.) On February 12, 2014, Defendants filed a reply. (ECF No. 36.) On February 20, 2014, findings and recommendations issued recommending granting in part Defendants' motion to dismiss. (ECF No. 38.) Plaintiffs filed objections to the findings and recommendations on March 6, 2014. (ECF No. 40.)

On May 10, 2014, District Judge Lawrence J. O'Neill issued an order adopting the findings and recommendations and dismissing Plaintiff's first amended complaint for failure to state a claim. (ECF No. 41.). On March 24, 2014, Plaintiffs filed a second amended complaint. (ECF No. 43.) Defendants filed a motion to dismiss on April 28, 2014. (ECF No. 44.) On June 6, 2014, an order was filed granting the parties stipulation to continue the hearing on the motion to dismiss to July 9, 2014. (ECF No. 54.) Plaintiffs filed an opposition and amended opposition on June 20, 2014. (ECF Nos. 55, 56.) Defendants filed a reply on July 2, 2014. (ECF No. 58.)

The Court heard oral arguments on July 9, 2014. (ECF No. 60.) Counsel Ian Wallach, Mark Ozzello and Nazareth Haysbert appeared for Plaintiffs and Counsel Jon Allin appeared for Defendants. (Id.) Having considered the moving, opposition and reply papers, and arguments presented at the July 9, 2014 hearing, the Court issues the following findings and recommendation recommending that Defendants' motion to dismiss be granted in part and denied in part.

## II.

## COMPLAINT ALLEGATIONS

Plaintiffs are current or former inmates who allegedly contracted disseminated Valley Fever while incarcerated at Pleasant Valley State Prison ("PVSP") or Avenal State Prison

("ASP"). (Sec. Am. Compl. ¶¶ 3-9,[1] ECF No. 43.) This action is brought on behalf of three subclasses of Plaintiffs: 1) African-American inmates, 2) inmates over the age of 55, and 3) immune-compromised inmates who were incarcerated at PVSP or ASP from July 8, 2009 through the present and contracted Valley Fever. (Id. at ¶ 20.)

Plaintiffs allege that Coccidioidomycosis ("Valley Fever") is a serious infectious disease which is contracted by inhalation of an airborne fungus and is prevalent in the San Joaquin Valley of California. (Id. at ¶ 28.) The majority of people who are infected with Valley Fever have little or no symptoms. (Id. at ¶ 29.) However, approximately one to five percent of those infected develop disseminated disease. (Id.) Once contracted there is no cure for the disease. (Id. at ¶ 30.) Disseminated Valley Fever is progressive, painful, and debilitating and fatal if left untreated. (Id.)

Epidemiological studies have established that African-Americans, persons over the age of 55, and those in an immune-compromised state are at higher risk for developing Valley Fever. (Id. at ¶ 32.) The risk of developing disseminated disease for African-Americans is ten-fold than that of the general population. (Id.)

The CDCR does not provide post-release health care once an inmate is released from custody. (Id. at ¶ 33.) Treatment for Valley Fever can cost for hundreds to thousands of dollars per month. (Id. at ¶ 34.)

In June of 1994, the U.S. Centers for Disease Control and Prevention ("CDC") published an article reporting on the impact of Valley Fever in California and that 70% of the reported cases in California arose in the San Joaquin Valley. (Id. at ¶ 36.) In September 1995, the CDCR issued a memorandum describing the illness, its long term effects, and the increased risk of acquiring Valley Fever in the subclasses identified by Plaintiffs. (Id. at ¶ 37.) In September of 1996, an article was published by two doctors from the University of California-San Diego, School of Medicine, commenting on the Valley Fever epidemic of 1991-1993. (Id. at ¶ 40.)

In 1996, the National Foundation for Infectious Diseases held an International Conference

---

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

3

on Valley Fever and published a summary of the articles discussed at the conference. Included in these articles was the California Health Services Policy Statement on Coccidioidomycosis which stated that from 1991 to 1993 California was spending $60 million in health care costs from Valley Fever infections. The report recognized that Plaintiffs' subclasses were at a higher risk for developing Valley Fever. The report also identified the areas that house PVSP and ASP as the most likely place to generate Valley Fever infections and recommended preventive measures, such as using spherulin skin tests to identify those not vulnerable to infection, the use of dust control measures, masks and wetting of the soil. (Id. at ¶ 41.)

In 2006, the California Department Public Health ("CDPH") issued a report addressing Valley Fever at PVSP and ASP and made suggestions to reduce the amount of Valley Fever infections experienced by individuals in Plaintiff's subclasses. These suggestions were not implemented by the CDCR. (Id. at ¶ 45.)

A memo dated November 20, 2007 to institutional staff, including the Wardens of eight prisons located in the hyper endemic area discussed the significant increase in the number of Valley Fever cases among inmates at PVSP and ASP in 2005. (Id. at ¶ 60.)

The Federal Receiver, J. Clark Kelso, issued an April 16, 2012 report indicating that the Valley Fever health crisis had not abated. (Id. at ¶ 75.) In April 2012, the CCHCS also issued a report addressing Valley Fever in California Prisons which found that between 2006 and 2010 no action taken by CDCR had any effect on the incidence rates of Valley Fever at PVSP or ASP. (Id. at ¶ 76.) The report confirmed that African-American men died from Valley Fever at far higher rates than the general inmate population. (Id.)

On November 14, 2012, Mr. Kelso recommended several actions that could be taken immediately. (Id. at 78.) On December 3, 2012, Defendants Brown and Beard authorized CDCR to request assistance from CDPH. (Id. at 79.)

On April 4, 2014, CDPH provided a response to CDCR which noted that a factor that probably contributed to the high rate of Valley Fever was housing high risk inmates, such as African-Americans, at PVSP and ASP. (Id. at ¶ 80.) Mr. Kelso issued a report on April 26, 2013 that warned of the severe risk of disseminated Valley Fever and recommended exclusion of

African-American inmates, inmates over 55 years old, and those with compromised immune systems from PVSP and ASP.  (Id. at ¶ 70.)  On April 29, 2013, Mr. Kelso promulgated a Valley Fever exclusion policy which excluded African-Americans, inmates who are immune compromised and inmates over 55 years of age from being housed at PVSP or ASP.  (Id. at ¶ 80.)  On May 1, 2013, the policy was revised to include inmates with diabetes mellitus.  (Id.)

**Arthur Duane Jackson**

Plaintiff A. Jackson, an African-American inmate serving a 43 years to life sentence, was transferred to PVSP around July 2009.  (Id. at ¶¶ 3, 91, 93.)  At the time of his transfer, Plaintiff A. Jackson was in good health.  (Id. at ¶ 91.)  Plaintiff A. Jackson experienced symptoms of Valley Fever in December 2011, and was temporarily blind as a result of the disseminated infection.  (Id.)  Plaintiff A. Jackson received treatment when he became ill, but his condition worsened and he developed pneumonia.  (Id. at ¶ 92.)  Plaintiff A. Jackson continues to suffer from the disease.  (Id. at ¶ 93.)  He is receiving medication and is partially blind in his left eye due to the Valley Fever infection and suffers from severe headaches on a daily basis.  (Id. at ¶ 53.)

**Leonard M. Lujan**

Plaintiff Lujan is a 62 year old former inmate who was diagnosed with cancer prior to contracting Valley Fever in November 2010 while housed at ASP.  (Id. at ¶¶ 4, 94.)  Following his release from custody, Plaintiff Lujan continues to experience complications of Valley Fever such as pain, a black spot on his lung, difficulty walking, constant fever, cold sweats, and difficulty breathing and sleeping.  (Id. at 95.)

**Marcus Jackson**

Plaintiff M. Jackson is an African-American former inmate who was ordered into the custody of the CDCR in July 2009.  (Id. at ¶ 5.)  Plaintiff contracted Valley Fever while housed at PVSP in October 2011.  (Id. at ¶¶ 5, 96.)  Following his release from custody, Plaintiff M. Jackson is experiencing panic attacks, mental stress, sleeplessness, nausea, inactivity, and vomiting.  (Id. at ¶ 97.)

///

**Rodney Taylor**

Plaintiff Taylor is an African-American former inmate who was in the custody of the CDCR from June 2010 through October 2011. (Id. at ¶¶ 6, 98.) Plaintiff Taylor had diabetes at the time he was transferred to ASP. (Id. at ¶ 6.) Plaintiff Taylor lost twenty to thirty pounds in three weeks as a result of the disseminated infection. (Id. at ¶ 98.) Following his release from custody, Plaintiff is experiencing extreme headaches, difficulty walking, lack of endurance, frequent colds, fatigue, and back pain. (Id. at ¶ 99.)

**Lacedric Johnson**

Plaintiff L. Johnson is an African-American inmate who is not scheduled to be released from custody until 2027. (Id. at ¶¶ 7, 100.) Plaintiff L. Johnson contracted Valley Fever in October 2011 while incarcerated at PVSP and suffers from lung damage, fever, sweats, headaches, loss of concentration, aching joints, severe weight swings, loss of body hair, lightening of skin pigmentation, rash, dark spots on his skin, shortness of breath, fatigue, sleeplessness, back pain and side effects from his prescribed medication as a result of Valley Fever. (Id. at ¶¶ 7, 100.)

**L.T. Belton**

Plaintiff Belton is an African-American inmate who contracted Valley Fever in August 2010 while incarcerated at ASP. (Id. at ¶ 8.) Plaintiff Belton suffers from headaches, fatigue, difficulty sleeping, joint pain, shortness of breath, numbness on bottom of foot, and difficulty with bowel movements. (Id. at ¶ 101.) Plaintiff Belton is undergoing treatment for Valley Fever and taking medication daily. (Id. at ¶ 102.)

**Norman Johnson**

Plaintiff N. Johnson is an African-American inmate who was in relatively good health at the time he was transferred to ASP in May 2012. (Id. at ¶¶ 9, 103.) Plaintiff N. Johnson contracted Valley Fever in July 2012 while incarcerated at ASP. (Id. at ¶ 9.) Plaintiff N. Johnson is scheduled to be released from custody in July 2017. (Id. at ¶ 104.) Plaintiff N. Johnson experienced chills, lack of appetite, night sweats, chest pain, shortness of breath, muscle and joint pain, fever, and allergies as a result of his disseminated Valley Fever infection. (Id. at ¶ 104.)

Plaintiffs bring this action alleging deliberate indifference in violation of the Eighth Amendment; racial discrimination in violation the Fourteenth Amendment; racial discrimination in violation of 42 U.S.C. § 1981; and state law claims of negligence.  (Id. at ¶¶ 108-195.)  Plaintiffs are seeking compensatory damages and injunctive relief.  (Id. at p. 49.)

### III.

### LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as true. Iqbal, 556 U.S. at 678-79.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678.

### IV.

### DISCUSSION

Defendants bring this motion to dismiss the racial discrimination claims pursuant to Rule 12(b)(6) on the grounds that they fail to state a cognizable claim. (Mem. of P. & A. in Supp. of Mot. to Dismiss Sec. Am. Compl. 2, ECF No. 44-1.)  Plaintiffs contend that the complaint contains sufficient factual allegations to show that African-American inmates suffered staggeringly higher rates than other races to show a discriminatory intent. (Pls.' Opp. to Defs.' Mot. to Dismiss Sec. Am. Compl. 7, ECF No. 56-1.)

    **A.**    **Second Cause of Action – Racial Discrimination**

Plaintiff bring the second cause of action for racial discrimination in violation of 42 U.S.C. § 1983.  Defendants move to dismiss the equal protection claim on the grounds that African-American inmates were not treated differently than inmates of any other race and

disparate treatment is not sufficient to state a claim.

An equal protection claim may be established by showing that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class, Lee v. City of Los Angeles, 250 F.3d 668, 686 (2001); Barren v. Harrington, 152 F.3d 1193, 1194 (1998), or that similarly situated individuals were intentionally treated differently without a rational relationship to a legitimate state purpose, Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (2005); Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Discriminatory intent implies that "the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979).

In this instance, Plaintiffs allege that the defendants had a racially discriminatory policy of allowing African-American inmates to be housed at PVSP and ASP. The alleged discriminatory policy is race neutral on its face. No inmates are assigned or excluded from being housed at PVSP or ASP based upon their race. Therefore, the question is whether there are allegations in the second amended complaint to state a plausible claim that the adverse effect upon African-Americans reflects invidious race based discrimination. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009); Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009); Feeney, 442 U.S. at 274. Plaintiffs argue that intentional discrimination can be inferred because the complaint alleges a history of exclusion that affected African-Americans at higher rates than all other races. Racially disproportionate impact is not sufficient to prove an equal protection claim, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265-66 (1977); Washington v. Davis, 426 U.S. 229, 242 (1976).

The Equal Protection Clause is violated when the discriminatory impact is traced to a discriminatory purpose. Feeney, 442 U.S. at 273. Racial discrimination can emerge from the effect of the state action where it weighs more heavily on one race than another, Arlington Heights, 429 U.S. at 266, and a discriminatory purpose may be inferred from the totality of the relevant facts, Washington, 426 U.S. at 242. "If the impact of [the action] could not be plausibly

explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral." Feeney, 442 U.S. at 275.

In this instance, Plaintiffs second amended complaint contains factual allegations that the named defendants were aware of the risk to African American inmates of contracting disseminated disease and were being affected at a higher percentage than the general population. Having this knowledge Defendants continued the policy of housing these inmates at PVSP and ASP subjecting them to this risk.

Where intent is an element of the claim, Plaintiffs are required to state in the complaint "nonconclusoray allegations setting forth evidence of unlawful intent." Oona R.-S. by Kate S. v. Santa Rosa Schools, 89 F.Supp.1452, 1468 n.14 (N.D. Cal. 1995) (quoting Branch v. Tunnell, 937 F.2d 1382, 1386 (9th Cir. 1991)). While the second amended complaint does not contain any factual allegations to show that there was a discriminatory intent by any named defendant, at the pleading stage, the allegations in the complaint merely need to allege facts susceptible to infer discriminatory intent. Byrd v. Maricopa County Sheriff's Dept., 565 F.3d 1205, 1213 (9th Cir. 2009).

At the pleading stage, the Court finds that Plaintiffs' allegations are sufficient to state a cognizable claim for a violation of the Equal Protection Clause. The Court recommends that Defendants' motion to dismiss the second cause of action be denied.

**B.  Third Cause of Action – Policy, Custom, and Practice**

Defendants move to dismiss the third cause of action for failure to state a racial discrimination claim. Plaintiffs' third cause of action alleges that the defendants have a custom, policy, and practice that is deliberately indifferent in violation of the Eighth Amendment and is racially discriminatory in violation of the Equal Protection Clause.

As discussed above, the allegations in the complaint are sufficient to state a claim that the defendants in this action had a custom, policy and practice of failing to exclude African-American inmates from being housed at PVSP and ASP in violation of the Equal Protection Clause. For that reason, the Court recommends that Defendants' motion to dismiss the equal protection claims from the third cause of action be denied.

**C.     Fourth Cause of Action – Racial Discrimination**

Plaintiffs' fourth cause of action alleges racial discrimination in violation of 42 U.S.C. § 1981.  Defendants move to dismiss the fourth cause of action for failure to state a claim. Plaintiffs contend that the allegations in the complaint are sufficient to show that they were treated differently than white citizens and that the district judge recognized that section 1981 does not require a contract by allowing them leave to amend the complaint.

While Defendants argue that a required element of section 1981 is treatment that is different than that of white citizens, "[t]o establish a claim under § 1981, the plaintiffs must show that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996).  A plaintiff is not required to show that he was treated differently than white citizens to state a claim under section 1981.  Similar to a violation of equal protection, to prevail on this claim, Plaintiffs must "prove as an element of the cause of action some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the [official's] action." Dennis v. Thurman, 959 F.Supp. 1253 (C.D. Cal. 1997) (internal punctuation and citations omitted); Hispanic Taco Vendors of Washington v. City of Pasco, 790 F.Supp. 1023, 1031 (E.D. Wash. 1991).  Section 1981 can only be violated by purposeful discrimination. General Bld. Contractor's Ass'n, Inc., 458 U.S. at 391.

   1.     Like Punishment Clause

Initially, the Court notes that the district judge, by allowing Plaintiffs an opportunity to amend the complaint, did not find that Plaintiffs were able to state a claim under section 1981. The order adopting the findings and recommendations stated that as pled Plaintiffs had not stated a claim and allowed them an opportunity to amend.  Therefore, the Court shall address whether Plaintiffs can state a claim under section 1981.  Initially, the Court considers the history of the statute.

Section 1981(a) provides that

All persons within the jurisdiction of the United States shall have the same right

> in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

This statute was initially enacted in the Civil Rights Act of 1866. In introducing the bill to enact the Civil Rights Act of 1866, Senator Trumbull of Illinois, Chairman of the Judiciary Committee, pointed out it would "affirmatively secure for all men, whatever their race or color, what the Senator called the 'great fundamental rights[,]' 'the right to acquire property, the right to go and come at pleasure, the right to enforce rights in courts, to make contracts, and to inherit and dispose of property.' " Jones v. Alfred H. Mayer Co., 392 U.S. 409, 431-32 (1968). When the Civil Rights Act of 1866 was passed the legislature "believed that it was approving a comprehensive statute forbidding all racial discrimination affecting the basic civil rights enumerated in the Act." Jones, 392 U.S at 435. The supporters of the bill emphasized that its purpose was to eradicate blatant deprivations of civil rights. General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 388 (1982). In addressing the Civil Rights Act, the Supreme Court has found that "we must accord it a sweep as broad as its language." Jones, 392 U.S at 437 (quoting United States v. Price, 383 U.S. 787, 801 (1966).

The Supreme Court has recognized that "[s]ection 1981 has a much broader focus than contractual rights." Goodman v. Lukens Steel Co., 482 U.S. 656, 661 (1987) (superseded by statute on other grounds). Courts have recognized the right to bring suit under section 1981 outside of cases involving the right to contract. See Spriggs v. City of Chicago, 523 F.Supp. 138, 144, 147 (D.C. Ill. 1981) (construing section 1981 to reach a claim that the city had a policy of violence toward African-Americans); Mendez v. Rutherford, 687 F.Supp.412 (N.D. Ill. 1988) (racially motivated arrest and beating fall within the like punishment and equal benefits clause of section 1981); Jones v. City of Philadelphia, 491 F.Supp. 284, 289 (D.C. Pa. 1980) (allowing municipal liability claim based on assault and arrest without probable cause to proceed under the full and equal benefit and like punishment clauses of section 1981); Milburn v. Girard, 441 F.Supp. 184, 190 (D.C. Pa. 1977) (racially motivated beating and false arrest actionable under section 1981); Raffety v. Prince George's County, 423 F.Supp. 1045, 1062 (D. Md. 1976)

(racially motivated detention, interrogation, and investigation by law enforcement is actionable under section 1981); Hawk v. Perillo, 642 F.Supp. 380, 385 (N.D. Ill 1985) (police failure to apprehend white attackers because victims were African-American states a claim under section 1981); Central Presbyterian Church v. Black Liberation Front, 303 F.Supp. 894, 901 (D.C. Mo. 1969) (white congregation stated a claim under the equal benefit of laws clause where black activists deprived them of the right to use their property for religious services).

In Haugabrook v. City of Chicago, 545 F.Supp. 276, 280 n.5 (D.C. Ill. 1982), the court briefly addressed the issue of section 1981 stating "that section 1981 is not confined to contractual matters, though it is most often invoked in that context." "As the Third Circuit noted in Hall v. Pennsylvania State Police, 570 F.2d 86, 91 (3d Cir. 1978), '(r)acially motivated misuse of governmental power falls within the ambit of its 'equal benefit' and 'like punishment clauses' which provide that 'all persons ... shall have the same right ... to the full and equal benefit of all laws ... for the security of persons and property ... as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties ... and exactions of every kind, and to no other.' " Id.

Based upon the history of the statute and the review of case law, the Court finds that Plaintiffs may state a cause of action under the like punishment clause for violation of section 1981 based upon the facts alleged in the complaint.

As discussed above, Plaintiffs' have set forth sufficient factual allegations for the Court to infer discriminatory intent at the pleading stage. For this reason, the Court recommends that Defendants' motion to dismiss the section 1981 claim based upon the violation of the like punishment clause be denied.

2.     Contracts Clause

The second amended complaint alleges that each of the defendants have a contractual relationship in which they are prohibited from discriminating against anyone based upon race. (ECF No. 43 at ¶¶ 166-171.) Plaintiffs contend that they are third party beneficiaries under the implied terms of the contract not to discriminate against prisoners on the basis of race. (Id. at ¶ 172.) Defendants move to dismiss the claim on the ground that Plaintiffs have not demonstrated that they are third party beneficiaries under the employment contracts. Plaintiffs contend that

they have sufficiently alleged facts to show the existence of an implied contract not to discriminate and it is plausible to infer that the third party inmates were intended to benefit.

To state a claim under the contracts clause of section 1981, a plaintiff must have rights under an existing or proposed contract that he wishes to enforce. Peterson v. State of California Dept. of Corrections and Rehabilitation, 451 F.Supp.2d 1092, 1102 (2006). Under California law, "public employment is not held by contract, but by statute." Shoemaker v. Meyers, 52 Cal.3d 1, 23 (1990). In Peterson, the court considered whether an employee of the CDCR could bring a claim under section 1981. 451 F.Supp.2d at 1102. The Peterson court applied the test set forth in Judie v. Hamilton, 872 F.2d 919, 922 (9th Cir.1989) which used a three step analysis to determine if the employee could bring a claim under section 1981. The three step analysis applied considers:

> First, courts are to look to the laws of the United States "so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect." If no suitable federal rule exists, courts undertake the second step by considering application of state "common law, as modified and changed by the constitution and statutes" of the forum State. A third step asserts the predominance of the federal interest: courts are to apply state law only if it is not "inconsistent with the Constitution and laws of the United States."

Peterson, 451 F.Supp.2d at 1102.

First, the court found that the civil rights statutes do not provide a body of law for interpreting contracts. Id. at 1103. The Peterson court then found that the California Supreme Court had recognized certain limited contractual rights afforded to public employees, specifically, the right to payment of salary that was earned, protection from a reduction of pension benefits, and from having the state fail to make contributions to the employees' retirement fund. Id. at 1103 (citing White v. Davis, 30 Cal.4th 528, 565-66 (2003).

The court then found that "at the heart of the protections afforded by section 1981 is the right to dispose of one's labor freely by contract." Peterson, 451 F.Supp.2d at 1103. The court considered that there is a strong federal policy to prevent employment discrimination and that to bar a public employee from bringing a discrimination claim would conflict with section 1981. Id. at 1104. The CDCR employee was able to bring a claim under section 1981 for discrimination in his employment. Id.

Plaintiffs in this action would have us extend this by finding that correctional employees contractual terms protected by section 1981 extend to statutes and regulations that prohibit mistreatment of prisoners by prison officials. The Court is not persuaded that the contract clause of section 1981 was intended to extend so far. The employee rights that have been found to be protected under section 1981 in Peterson are the rights to be free from discrimination in financial compensation from their employment. This is clearly consistent with the purposes of section 1981.

        a.      **Whether an Implied Contract Exists**

In determining whether a contract exists for the purposes of section 1981, the Court looks to the law of the forum state. Macedonia Church v. Lancaster Hotel Limited Partnership, 270 F.R.D. 107, 115 (D. Conn. 2010); Shumate v. Twin Tier Hospitality, LLC, 655 F.Supp.2d 521, 535 (M.D. Pa. 2009). California law provides that "[a]n implied contract is one, the existence and terms of which are manifested by conduct." Cal. Civ. Code § 1621. Therefore, an implied contract consists of obligations that arise from a mutual agreement and intent to promise that have not been expressed in words. Retired Employees Assn. of Orange County, Inc. v. County of Orange, 52 Cal.4th 1171, 1178 (2011). Government agencies may be bound by an implied contract as long as there are no statutory provisions against such arrangements. Id. at 1179.

Under California law an ordinance or regulation can create a contract where the legislation's text or the circumstances accompanying its passage indicate a clear intent to contract as opposed to the intent to make policy. Sonoma County Ass'n of Retired Employees v. Sonoma County, 708 F.3d 1109, 1114 (9th Cir. 2013). "[A] legislative intent to grant contractual rights can be implied from a statute if it contains an unambiguous element of exchange of consideration by a private party for consideration offered by the state." County of San Diego v. State, 164 Cal.App.4th 580, 604 (2008) (quoting California Teacher's Assn. v. Cory, 155 Cal.App.3d 494, 505 (1984). However, it is presumed that a statutory scheme is not intended to create private contractual rights. Retired Employees Assn. of Orange County, Inc., 52 Cal.4th at 1186.

CDCR regulations that require employees to treat inmates fairly and without discrimination do not evince a clear intent to contract as opposed to the intent to make policy.

Further, there are no allegations in the complaint that there was any bargained for exchange of consideration to create an implied contract. Sonoma County Ass'n of Retired Employees, 708 F.3d at 1117. The Court finds that the complaint fails to state a plausible claim that an implied contract existed between the CDCR and its employees as alleged in the second amended complaint.

### b. Whether a Third Party Claim Should be Recognized

In order to bring a claim, the plaintiff must have an impaired contractual relationship under which he has rights. Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006). While Courts have recognized situations in which third parties were intended beneficiaries under section 1981, the plaintiffs in those actions were intended to receive a direct benefit from the contract that was being challenged. See Macedonia Church v. Lancaster Hotel Limited Partnership, 270 F.R.D. 107, 115 (D. Conn. 2010) (church members are third party beneficiaries of church attempt to book group lodging); Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 436 (4th Cir. 2006) (refusal to allow daughter to purchase hair color addition to gift package purchased for her mother); Olzman v. Lake Hills Swim Club, Inc., 495 F.2d 1333, 1339 (2d Cir. 1974) (payment of fee conferred third party beneficiary status on invited guests to swim club); Jones v. Local 520, Inter. Union of Operating Engineers, 603 F.2d 664, 665 (7th Cir. 1979) (preferential hiring plan).[2]

In Domino's Pizza, Inc., the Supreme Court considered whether a sole shareholder and president of a corporation could bring a claim against a corporation for discrimination under section 1981. Id. at 472-73. The corporation had entered into several contracts to construct restaurants; and after the first building was completed, Domino's agent refused to execute estoppel certificates that were required for the corporation to receive financing. Id. at 473. The plaintiff alleged that Dominos refused to execute the certificates due to racial amicus toward him. Id. The Supreme Court found that the plaintiff could not state a claim under section 1981 unless he had injuries flowing from the breach of his own contractual relationship, not that of someone

---

[2] Compare Domino's Pizza, Inc., 546 U.S. at 476 (president of corporation); Beasley v. Arcaptia, Inc., 436 Fed.Appx. 264 (4th Cir. 2011) (franchisee) (unpublished); Brown-Hiltz v. United Airlines, 132 F.3d 36 (7th Cir. 1997) (consent decree) (unpublished); Doe v. Attorney General of United States, 941 F.2d 780 (9th Cir. 1991) (overruled on other grounds) (doctor not a third party beneficiary of contract between FBI and hospital)

15

else. 546 U.S. at 480. Domino's Pizza, Inc. did not address the issue of whether a third party a third party beneficiary could sue under section 1981 but left the issue open. Id. at 476 n.3.

In Lewis v. J.C. Penney Co., Inc., 948 F.Supp. 367 (D. Del. 1996), the court considered a claim that there was an unstated, unwritten contract between commercial establishments and the public that all who enter would be treated equally regardless of race. 948 F.Supp. at 372. The court found that "[a]llowing plaintiff to proceed under such a theory would come close to nullifying the contract requirement of section 1981 altogether, thereby transforming the statute into a general cause of action for race discrimination in all contexts which is not the result that was intended by Congress. Id. at 371-72.

Similarly here, the Court agrees that Plaintiffs' third party beneficiary claim would extend the contract clause of section 1981 into a general cause of action for race discrimination which was not the result intended by Congress. Plaintiffs are clearly not parties to any contract based on the allegations in the second amended complaint. To the extent that Plaintiffs are incidental beneficiaries under the regulations prohibiting discrimination, this is not sufficient to establish a contractual relationship under which Plaintiffs have rights. Domino's Pizza, Inc,, 546 U.S. at 476. Plaintiffs' claims are properly raised under the equal benefit or like punishment clauses of section 1981. Therefore, the Court recommends that Defendants' motion to dismiss Plaintiffs' claim based upon the contracts clause of section 1981 be granted without leave to amend.

## V.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS HEREBY RECOMMENDED that Defendants' motion to dismiss be GRANTED IN PART AND DENIED IN PART as follows:

1. Defendants' motion to dismiss Plaintiffs' claims based upon the contracts clause of 42 U.S.C. § 1981 be GRANTED; and

2. Defendants' motion to dismiss be denied in all other respects.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within fourteen (14) days of service of this recommendation, any party may file written objections to these

findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **July 30, 2014**

UNITED STATES MAGISTRATE JUDGE