# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ARTHUR DUANE JACKSON, et al.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**EDMUND G. BROWN, JR., et al.,**<br><br>**Defendants.** | **1:13-cv-1055-LJO-SAB**<br><br>**MEMORANDUM DECISION AND ORDER RE FINDINGS & RECOMMENDATIONS (Doc. 106) RE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 89)** |

## I. INTRODUCTION

Coccidioidomycosis, commonly known as "Valley Fever," is an infection caused by inhaling the spores of the fungus Coccidioides, which is endemic to the soil throughout the southwestern United States, and is particularly prevalent in California's San Joaquin Valley.[1] Valley Fever infections generally cause mild flu-like symptoms (or no symptoms at all), but the "disseminated" form of the disease, which occurs when the infection disseminates beyond the lungs and into other parts of the body, can cause serious, life-long health complications, and even death. Some groups of individuals, including certain ethnic groups, individuals over the age of 55, and individuals with compromised immune systems, are particularly susceptible of developing disseminated Valley Fever.

This is one of many civil rights cases currently pending in this district brought under 42 U.S.C. §§ 1983 ("§ 1983") and 1981 ("§ 1981") by current and former inmates who contracted Valley Fever while incarcerated at Pleasant Valley State Prison ("PVSP"), in Coalinga, a city in Fresno County, and Avenal State Prison ("ASP"), in Avenal, a city in Kings County. Both cities are in regions in the southern San Joaquin Valley, where cocci naturally exist. Plaintiffs,[2] who contracted Valley Fever while

---

[1] Valley Fever and the spores that cause it often are referred to interchangeably as "cocci."

[2] Plaintiffs are Arthur Jackson ("A. Jackson"), Leonard M. Lujan, Marcus Jackson ("M. Jackson"), Rodney Taylor, Lacedric Johnson ("C. Johnson"), L.T. Belton, and Norman Johnson ("N. Johnson"). SAC at 1.

incarcerated at either PVSP or ASP, bring this class action against Defendants for: (1) violation of the Eighth Amendment; (2) deprivation of equal protection; (3) racial discrimination; and (4) negligence. Doc. 43, Second Amended Complaint ("SAC") at 1. Plaintiffs' claims are premised on their assertion that Defendants' intentional actions and inaction unconstitutionally exposed them to an unreasonable risk of contracting Valley Fever and, ultimately, caused them to contract the disease.

Currently pending before the Court is Defendants' motion for judgment on the pleadings. Doc. 89 ("Defendants' MJP"). The Magistrate Judge issued Findings and Recommendations ("F&Rs"), Doc. 106, to which the parties filed objections and responses. Docs. 118, 120-24. Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has conducted a de novo review of the F&Rs and the relevant record. *See Wang v. Masaitis*, 416 F.3d 992, 1000 n.13 (9th Cir. 2005); Fed. R. Civ. P. 72(b)(3). For the following reasons, the Court ADOPTS the Magistrate Judge's recommendations, albeit at times for different or additional reasons than those contained in the F&Rs.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following is a summary of the SAC's allegations. For purposes of ruling on Defendants' MJP, the Court assumes the facts contained in the SAC are true. *See Harris v. Cnty of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012).

**A. The Parties.**

**1. Plaintiffs.**

The proposed Plaintiff Class is divided into three "subclasses." Proposed subclass 1 is composed of "[a]ll African-Americans who are, or were, incarcerated at PVSP or ASP, at any time from July 8, 2009 to the present, and who have contracted Disseminated Valley Fever . . . during, and as a result of, their incarceration at PVSP or ASP." *Id.* at ¶ 20. Proposed subclass 2 is "[a]ll persons over the age of 55 who are or were incarcerated at PVSP or ASP, at any time from July 8, 2009 to the present, and who had contracted Disseminated Valley Fever during, and as a result of, their incarceration at PVSP or ASP." *Id.* Proposed subclass 3 is "[a]ll persons who have been determined by the [California Department of Corrections & Rehabilitation ('CDCR')] to be in an immune-compromised state and who are, or were,

1  incarcerated at PVSP or ASP, at any time from July 8, 2009 to the present, and who have contracted

2  Disseminated Valley Fever during, and as a result of, their incarceration at PVSP or ASP." *Id.*

3      A. Jackson is a 40-year-old African-American, who is currently incarcerated at Folsom State

4  Prison. SAC at ¶ 3. He contracted disseminated Valley Fever in January 2012 while incarcerated at

5  PVSP. *Id.* He would be a member of proposed subclass 1. *Id.*

6      M. Jackson is African-American. *Id.* at ¶ 5. He contracted disseminated Valley Fever in October

7  2011 while incarcerated at PVSP. *Id.* He now lives in Hermosa Beach, California. *Id.* He would be a

8  member of proposed subclass 1. *Id.*

9      L. Johnson is an African-American, who is currently incarcerated at PVSP. *Id.* at ¶ 7. He

10  contracted disseminated Valley Fever in October 2011 while incarcerated at PVSP. *Id.* He would be a

11  member of proposed subclass 1. *Id.*

12      Taylor was a 46-year-old African-American at the time the SAC was filed. *Id.* at ¶ 6. He had

13  diabetes prior to December 2010. *Id.* He contracted disseminated Valley Fever in December 2010 while

14  incarcerated at ASP. He would be a member of proposed subclasses 1 and 3. *Id.* He died in August

15  2014.

16      Lujan is 62 years old and had cancer prior to November 2010. *Id.* at ¶ 4. He contracted

17  disseminated Valley Fever in November 2010 while incarcerated in ASP. *Id.* He now lives in

18  Sacramento, California. *Id.* He would be a member of proposed subclasses 2 and 3. *Id.*

19      Belton is a 55-year-old African-American, who is currently incarcerated at the California Men's

20  Colony in San Luis Obispo, California. *Id.* at ¶ 8. He contracted disseminated Valley Fever in August

21  2010 while incarcerated at ASP. *Id.* He would be a member of proposed subclasses 1 and 3. *Id.*

22      N. Johnson is an African-American, who is currently incarcerated at the California Rehabilitation

23  Center in Norco, California.[3] *Id.* at ¶ 9. He contracted disseminated Valley Fever in July 2012 while

24

25  ———————————

26  [3] Plaintiffs do not explicitly allege which proposed subclass to which N. Johnson belongs, *see* SAC at ¶ 9, but he falls into subclass 1.

incarcerated at ASP. Although Plaintiffs do not allege he would be a member of proposed subclass 1, *see id.* at ¶ 9, as an African-American, he would qualify as a member of the subclass.

**2. Defendants.**

Governor Brown became Governor of California on January 3, 2011. *Id.* at ¶ 49.

Matthew Cate was the Secretary of CDCR from 2008 to November 11, 2012. *Id.* at ¶¶ 12, 50. In that capacity, he was responsible for the operation of California state prisons and the health and welfare of the prison population, including Plaintiffs. *Id.*

Jeffrey Beard is the current Secretary of CDCR, and assumed that position on December 27, 2012. *Id.* at ¶¶ 13, 51. In that capacity, he is responsible for the operation of California state prisons and the health and welfare of the prison population, including Plaintiffs. *Id.*

P.D. Brazelton has served as the acting warden of PVSP since June 25, 2012. *Id.* at ¶¶ 14, 51. In that capacity, he is responsible for the operation of PVSP and the health and welfare of its prison population. *Id.*

James Hartley served as the acting warden of ASP from 2007 until his appointment as warden on March 27, 2009. *Id.* at ¶¶ 15, 53. In that capacity, he is responsible for the operation of ASP and the health and welfare of its prison population. *Id.*

All Defendants knew of the substantial risk of serious harm (*i.e.*, Valley Fever) to the Plaintiff subclasses while they were incarcerated at PVSP and ASP. *See, e.g., id.* at ¶¶ 11-15, 55.

**B. Valley Fever.**

Valley Fever has long been known as an infection disease that is contracted by inhaling an airborne fungus, *Coccidioides Immitis. Id.* at ¶ 28. The majority of those who develop a Valley Fever infection have few to no symptoms; minor symptoms generally resolve within weeks. *Id.* at ¶ 29. Approximately 1-5% of those infected, however, develop disseminated Valley Fever. *Id.* Studies have established that, for unknown reasons, African-Americans, individuals over 55, and

---

[4] The Court sometimes will refer to Taylor, Lujan, Belton, and N. Johnson collectively as "the ASP Plaintiffs."

immunocompromised individuals are at a higher risk for developing disseminated Valley Fever. For instance, the risk for African-Americans is almost ten times greater than it is for the general population. *Id.* at ¶¶ 32, 110.

Disseminated Valley Fever is progressive, painful, and debilitating, and is uniformly fatal if it progresses to meningitis and is left untreated. *Id.* at ¶ 30. Because there is no cure for disseminated Valley Fever, those who develop the disease "will, as a result of their infection, require medical monitoring and treatment throughout their lives to keep the infection under control." *Id.* at ¶¶ 20, 30.

In 1994, the U.S. Centers for Disease Control and Prevention ("CDC") issued a report by infectious disease experts, which discussed Valley Fever in California ("the CDC Report"). *Id.* at ¶ 36. The report found that 70% of the reported cases of Valley Fever arose in the San Joaquin Valley. *Id.*

In 1995, the Department of Corrections circulated a memorandum entitled "Early Diagnosis and Management of Coccidiodomycosis in California State Correctional Institutions." *Id.* at ¶ 37. The memorandum described Valley Fever, its long-term effects, and the increased risk of disseminated Valley Fever faced by individuals in certain groups, including the proposed Plaintiff subclasses. *Id.*

In 1996, physicians published an article in which they commented "on the Valley Fever epidemic of 1991-1993" discussed in the CDC Report. *Id.* at ¶ 40. The authors found that "the San Joaquin Valley, California, is one of the most highly coccidioidomycosis-endemic regions." *Id.* (citation omitted).

Also in 1996, the article "California Health Services Policy Statement on Coccidiodomycosis," was discussed at the International Conference on Coccidiodomycosis. *Id.* at ¶ 41. That report "identified the areas that house PVSP and ASP as the most endemic for the cocci spores and most likely place to generate cocci infections." *Id.* The report "identified, as preventative measures . . . the use of dust-control measures, masks, and the wetting of the soil." *Id.*

**C. *Plata v. Schwarzenegger*.**

In 2005, the California Correctional Health Care Services ("CCHCS") was ordered into a federal receivership to address numerous medical care issues throughout California prisons. *Id.* at ¶ 42; *see*

*Plata v. Schwarzenegger*, No. 3:01-SA-1351, 2005 WL 2932253 (N.D. Cal. Oct. 3, 2005). Most recently, the *Plata* court ordered that preventative measures, recommended to CDCR in 2006 by Federal receiver Clark Kelso, be implemented to protect individuals from becoming infected with Valley Fever. *Id.* at ¶ 43.[5]

**D. Post-*Plata* Receivership.**

In 2006, the California Department of Public Health ("CDPH") issued a report addressing Valley Fever at PVSP and ASP. *Id.* at ¶ 45. That report suggested the prisons implement environmental mitigation measures to reduce the amount of cocci spores in the air in order to reduce Valley Fever infection rates. *Id.* CDCR, however, did not implement "a great majority" of these suggestions. *Id.*; *id.* at ¶ 112.

In 2007, a published study reported that the construction of new prisons in areas affected by Valley Fever "had led to a marked increase in the number of cocci cases and identified the high infection rate at these facilities." *Id.* at ¶ 111.

Also in 2007, the Statewide Medical Director for California Prisoner Healthcare Services issued a report to the federal receiver entitled, "Recommendations to Coccidioidomycosis Mitigation in Prisons in the Hyperendemic Areas in California," which stated that Defendants were recommending measures for immediate implementation, including environmental mitigation techniques at PVSP and ASP; deferring any new construction that would lead to additional prisoners' being housed in the hyperendemic areas; providing an indoor recreation area for inmates to use during high wind/dust events; and continuing to exclude certain inmates from facilities in the hyperendemic area, among several other recommended measures. *Id.* at ¶ 113.

Since 2007, approximately 40 inmates at PVSP and ASP have died of Valley Fever. *Id.* at ¶ 46. It is unknown how many former PVSP and ASP inmates have died either as a result of Valley Fever, or for not having access to adequate health care for the disease. *Id.*

---

[5] It appears that Plaintiffs are referring to the *Plata* court's June 24, 2013 order entitled, "Order Granting Plaintiffs' Motion for Relief re: Valley Fever at Pleasant Valley and Avenal State Prisons." *See Plata*, 2013 WL 3200587 (N.D. Cal. June 24, 2013) ("*Plata* Valley Fever Order"); Doc. 124 at 7.

in 2006 and 2007, a Fresno County Grand Jury "had undertaken the task of evaluating the problematic healthcare at PVSP and had made a series of recommendations." *Id.* at ¶ 54. Beginning in 2007, that grand jury issued public reports directly to CDCR executives, including Cate, Beard, and Brazelton, concerning Valley Fever at PVSP. *Id.* at ¶ 55. In one report, the grand jury found that "'[l]ocal prison officials are well aware of the [Valley Fever] health crisis,'" and that inmates and staff continue to be at risk of the disease. *Id.* The grand jury further found "that inmates like Plaintiffs were at drastically increased risk of contracting Valley Fever and susceptible to potentially fatal health consequences as a result, if at-risk inmates were housed at or remained at PVSP." *Id.* at ¶ 58. The grand jury required Cate, Beard, and Brazelton to respond to these findings. *Id.* James Yates, the former warden of PVSP, sent copies of his response to Cate and other CDCR officials implicated in the grand jury investigation. *Id.* at ¶ 56. Governor Brown also was aware of the grand jury's findings. *Id.* at ¶ 58.

In response to the increase of Valley Fever cases among inmates, the CDPH conducted an investigation at PVSP in 2006, "confirmed the outbreak," and made recommendations to exclude high-risk inmates as "the most effective method to decrease risk." *Id.* at ¶ 62. The CDPH report found the number of reported cases of Valley Fever in 2005 at PVSP was three times higher than Fresno County combined. *Id.* at ¶ 65. The CDPH "concluded that further research into relocation efforts were needed for the highest-at risk groups to areas that are not hyper-endemic to Valley Fever and, at a minimum, take steps at the prisons to minimize exposure, including ventilation, respiratory protection, and dust suppression and soil control." *Id.* at ¶ 66.

In January 2007, PVSP refused to implement CDPH's recommendation to increase ground cover through the prison, which was known to be effective at reducing airborne spores. *Id.* at ¶ 68. PVSP officials concluded it was not feasible due to potential costs. *Id.*

Also in January 2007, a report was issued to the CDCR and other "State individuals." *Id.* at ¶ 136. The report identified "black race" as a "significant risk factor for [Valley Fever] at PVSP in 2005." *Id.* The report found that "[b]lack inmates had the highest attack rate at five percent and, in univariate analysis, were almost two times more likely than white inmates to be diagnosed with [Valley Fever]."

*Id.* The report found, however, that

> Having a chronic medical condition and residence in a facility with increased outdoor exposure have the highest population attributable risks; this suggest that interventions targeting these two factors will have greater impact to decrease CM risk at PVSP than interventions that target other risk factors, such as black race or age.

*Id.* (emphasis omitted). The report did not mention or recommend removing African-American inmates from prisons located in hyperendemic regions, though it recommended the exclusion of individuals with various "chronic health conditions." *Id.*

In June 2007, the California Department of Health Services ("CDHS") made specific recommendations for reducing Valley Fever incidence rates among CDCR inmates. *Id.* at ¶ 67. Among other things, the CDHS recommended that CDCR should consider relocating all inmates from PVSP "to institutions with rates of cocci equal to or better than their local community rates." *Id.*

Also in June 2007, the federal receiver in the *Plata* case convened a committee of his staff and various Valley Fever experts, which issued a report with 26 recommendations. *Id.* at ¶ 71.

In November 2007, CDCR circulated a memorandum ("the 2007 memo") "to institution staff, including Wardens of eight prisons located in the hyperendemic area, identifying a significant increase in the number of Valley Fever cases, with deaths attributed to this disease, among inmates at PVSP and ASP in calendar year 2005." *Id.* at ¶ 60 (quotation marks omitted); *see also id.* at ¶ 136. The memorandum recognized a mitigation approach that would transfer inmates out of PVSP and ASP if they met the "cocci susceptibility exclusion criteria." *Id.* The 2007 memo built on recommendations from the Federal receiver, who found that African-Americans were at a high risk of contracting disseminated Valley Fever. *Id.* at ¶ 136. It recommended that high-risk inmates who met certain criteria be excluded from hyperendemic prisons; the criteria did not list African-Americans as "high risk." *Id.* at ¶¶ 72, 136.

In December 2011, PVSP stabilized the soil on some of its unpaved surfaces, but "nothing was done at ASP." *Id.* at ¶ 74; *see also id.* at ¶ 126. Neither prison transferred African-American inmates or inmates older than 55 years old. *Id.* at ¶ 74.

In April 2012, the federal receiver issued a report, which "indicated that the Valley Fever health

8

crisis had not abated. *Id.* at ¶ 75. The report noted that from 2006 to 2010, 27 inmates had died of

Valley Fever. *Id.* In a subsequent study, the federal receiver found that 36 inmates had died between

2006 and 2011. *Id.* Of those deaths, "97% were in the hyperendemic region, 70% were African-

American." *Id.*

Also in April 2012, CCHCS issued a report entitled "Coccidioidomycosis in California Adult

Prisons, 2006-2010" ("the 2012 CCHCS report"[6]) and circulated it among CDCR staff. *Id.* at ¶ 76. The

report found that no action purportedly taken by CDCR between 2006 and 2010 had any effect on

Valley Fever incidence rates at PVSP and ASP. *Id.* at ¶ 76. The report observed that incidence rates of

Valley Fever at PVSP and ASP were "drastically elevated," and that African-Americans in particular

were at increased risk of contracting disseminated Valley Fever. *Id.* Specifically, the report found that

between 2006-2010, "[i]n comparison with the rate in California (7/100,000), the rate at PVSP was

1,001 times higher (7,011/100,000), [and] the rate at ASP was 189 times higher (1,326/100,000)." 2012

CCHCS report at 1. Further, those rates were "much higher than the rate in Kern County, the county

with the highest rate of cocci in California (135/100,000) . . . [and] were higher than rates in the counties

in which they are located." *Id.* at 1-3. "PVSP's rates were particularly high in comparison with

communities in its immediate surroundings. The median annual reported cocci rate at PVSP for 2007-

2010 was six times the rate of the adjacent mental health facility, [Coalinga State Hospital ("CSH")], 17

times the rate of the city of Coalinga (excluding PVSP and CSH), and 489 times the rate of Fresno

County (excluding Coalinga, PVSP, and CSH)." *Id.* at 4. The report made a number of recommendations

to reduce the incidence rate of Valley Fever at PVSP and ASP. *See id.* at 7-9.

In December 2012, Governor Brown authorized CDCR to request assistance from CDPH. *Id.* at ¶

79. It was not until April 2013, at the request of the federal receiver, "that additional measures were

taken to begin determining what resources would be necessary and available for analysis." *Id.* At some

point in 2013, "dust control devices were installed at PVSP and ASP." *Id.* at ¶ 126.

---

[6] Plaintiffs attached the CCHCS report to their objections to the F&Rs. *See* Doc. 118-4. Because it is referenced in the SAC, the Court may consider it when ruling on Defendants' MJP. *See Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

Also in April 2013, the federal receiver promulgated a Valley Fever exclusion policy that recommended excluding from PVSP and ASP all inmates who are African-American, immune-compromised, or over the age of 55. *Id.* at ¶¶ 80, 114. The Receiver began an independent analysis of the Valley Fever situation at PVSP and ASP because Defendants had "moved slowly to develop a plan for responding to the ongoing problem at [PVSP and ASP]." *Id.* at ¶ 115. In the Receiver's view, Defendants did not promptly contact CDC, the National Institute for Occupational Safety & Health, or the California State Public Health Department ("SPHD"). *Id.*

Plaintiffs seek relief for inmates at PVSP and ASP who contracted Valley Fever "as a result of CDCR's failure to implement the measures advised by the Federal receiver." *Id.* at ¶ 44. Plaintiffs claim Defendants knowingly exposed them to Valley Fever infection despite their known hyper-susceptibility. Defendants have been aware of the decades-long Valley Fever "epidemic" at PVSP and ASP since 2006, and also have been aware of the above-mentioned reports, memoranda, and recommendations by various government entities by virtue of their being defendants in *Plata* and/or by virtue of their "top executive positions." *See, e.g.*, *id.* at ¶¶ 11-15, 48-84, 87-90, 121. Defendants failed to respond to any of the directives and/or to take appropriate actions to protect the proposed Plaintiff subclasses. *Id.* at ¶ 47.

**E. Plaintiffs' Causes of Action.**

Plaintiffs bring six causes of action against all Defendants.

The first, brought under § 1983, alleges Defendants violated Plaintiffs' Eighth Amendment rights. *Id.* at 29. Plaintiffs allege that Defendants knew members of the proposed Plaintiff subclasses are far more susceptible to contracting Valley Fever in general and disseminated Valley Fever in particular, *id.* at ¶¶ 119, 126, yet failed "to categorically exclude those individuals from incarceration at PVSP or ASP despite the authority to do so," *id.* at ¶ 117, and employed no screening process to divert members of the proposed Plaintiff subclasses from being housed at those prisons. *Id.* at ¶ 118. Plaintiffs assert Defendants had a duty to protect Plaintiffs from Valley Fever, *id.* at ¶ 123, and therefore Defendants should have: (1) excluded members of the proposed Plaintiff subclasses from being housed at PVSP and ASP; (2) taken measures to prevent them from being exposed to Valley Fever spores; or (3) moved them

to other facilities. *Id.* at ¶ 120.

Defendants, however, knowingly and unreasonably disregarded the risk of harm posed by Valley Fever at PVSP and ASP and "fail[ed] to take reasonable and recommended measures to abate the risk," in violation of the Eighth Amendment. *Id.* at ¶ 122. The only preventative measures Defendants undertook were temporarily stabilizing soil at PVSP in 2011 and installing "some dust control devices" at PVSP and ASP in 2013. *Id.* at ¶ 126. As a result of "CDCR's failure to implement the measures advised by the Federal receiver," Plaintiffs contracted Valley Fever. *Id.* at ¶ 44. According to Plaintiffs, the proposed Plaintiff subclasses incarcerated at PVSP and ASP "continue to become infected at alarming rates—far greater than that experienced by any other population." *Id.* at ¶ 118.

Plaintiffs' second cause of action for racial discrimination in violation of the Fourteen Amendment is brought under § 1983 by proposed Plaintiff subclass 1 (African-Americans) against all Defendants. *See id.* at 33; *id.* at ¶ 129. Plaintiffs allege African-Americans are significantly more susceptible to contracting Valley Fever, significantly more likely to develop disseminated Valley Fever than any other racial group, and represent a disproportional amount of serious Valley Fever cases and Valley Fever-related deaths. *Id.* at ¶¶ 130, 133. Plaintiffs claim that Defendants knew of the heightened risk African-Americans face, yet they intentionally failed to take any preventative measures, which disproportionately impacted African-Americans at PVSP and ASP. *Id.* at ¶ 135. Plaintiffs contend that Defendants intentionally failed to act, including but not limited to refusing to transfer and exclude African-Americans from being housed at PVSP and ASP, because the members of proposed Plaintiff subclass 1 are African-American. *Id.* at ¶¶ 139, 142.

Plaintiffs' third cause of action, alleged against all Defendants, is for "violation of . . . § 1983 [custom, policy, and practice]." *Id.* at 40 (emphasis omitted). Plaintiffs allege Defendants "intentionally failed to act due to a continuing, widespread, and persistent pattern of deliberate indifference to the substantial risk of harm to the at-risk inmates" at PVSP and ASP. *Id.* at ¶ 145. Although Defendants knew of these risks, they remained deliberately indifferent to the pattern and practice of constitutional violations at PVSP and ASP by failing to take action to remedy that conduct. *Id.* at ¶ 147.

Plaintiffs' fourth cause of action, alleged against all Defendants, is for violation of . . . § 1981 [racial discrimination – unlike punishment/impairment of the right to contract]." *Id.* at 42 (emphasis omitted). Plaintiffs bring this claim "under the right to be subjected to Like Punishment as that of White citizens," as provided for in § 1981. *Id.* at ¶ 152. Plaintiffs claim members of proposed Plaintiff subclass 1 (African-Americans) have been subjected to punishment unlike white citizens, and therefore have been disparately impacted compared to other inmates at PVSP and ASP. *Id.* at ¶¶ 156-57.

In the alternative, Plaintiffs bring the claim "under the Right to Make and Enforce Contracts," as provided for in § 1981. *Id.* at ¶ 164. Plaintiffs allege they "have rights as third party beneficiaries to Defendants' express and implied contractual obligation not to discriminate against California prison inmates on the basis of race," and Defendants have breached those contractual obligations. *Id.* at ¶ 172; *see also id.* at ¶¶ 171, 180.

Plaintiffs' fifth cause of action is a state law negligence claim. *Id.* at 47. Plaintiffs allege Defendants negligently failed to operate and maintain PVSP and ASP in a safe and habitable condition. *Id.* at ¶ 189. Plaintiffs assert Defendants negligently and wrongfully failed to take steps to make PVSP and ASP safe and failed to adequately warn Plaintiffs of the dangerous conditions, namely, "the prisons' location on a site regularly immersed in airborne dust containing the airborne [Valley Fever] spores." *Id.*

Plaintiffs sixth cause of action is a state law negligence claim in which they allege Defendants had a special relationship with Plaintiffs (*i.e.*, jailor-inmate), which required them to protect Plaintiffs from known and foreseeable harms. *Id.* at ¶ 192. Plaintiffs allege Defendants "were aware of the likelihood that—absent the implementation of available preventative measures—Plaintiffs could acquire disseminated [Valley Fever] as a result of the known defects at PVSP and ASP." *Id.* at ¶ 193. Defendants' failure to act caused Plaintiffs to contract disseminated Valley Fever. *Id.* at ¶ 195.

Plaintiffs seek various damages, including "the establishment of a comprehensive court-supervised program for medical treatment available for inmates no longer in custody and afflicted with chronic disseminated [Valley Fever]." *See id.* at 49.

**F. Defendants' MJP.**

Defendants move for judgment on the pleadings on five primary grounds: (1) the SAC does not state a claim for deliberate indifference or racial discrimination against Governor Brown; (2) the SAC does not plead a causal connection between Plaintiffs' contracting Valley Fever and any conduct by the Defendants; (3) Defendants are entitled to qualified immunity from Plaintiffs' constitutional claims; (4) the SAC's allegations cannot support a claim for injunctive relief; and (5) Plaintiffs' state law negligence claims are barred because Plaintiffs (a) failed to comply with the California State Tort Claim Act; (b) failed to plead exhaustion of administrative remedies; and (c) failed to comply with the applicable statute of limitations. *See* Doc. 89-2 at 2.

## III. <u>STANDARD OF DECISION</u>

Federal Rule of Civil Procedure 12(c) permits a party to seek judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." "A motion for judgment on the pleadings should be granted where it appears the moving party is entitled to judgment as a matter of law." *Geraci v. Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003). A "judgment on the pleadings is appropriate when, even if all allegations in the complaint are true, the moving party is entitled to judgment as a matter of law." *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 670 (9th Cir.1993).

"A judgment on the pleadings is a decision on the merits." *3550 Stevens Creek Assocs. v. Barclays Bank of California*, 915 F.2d 1355, 1356 (9th Cir. 1990). A Fed. R. Civ. P. 12(c) motion "is proper when there are no issues of material fact, and the moving party is entitled to judgment as a matter of law." *Id.* "[T]he central issue is whether, in light most favorable to the plaintiff, the complaint states a valid claim for relief." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417,420 (5th Cir.2001). Accordingly, "all allegations of fact of the opposing party are accepted as true." *Austad v. United States*, 386 F.2d 147, 149 (9th Cir. 1967). Thus, a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is "functionally identical" to a motion to dismiss under Rule 12(b)(6). *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). Although Rule 12(c) does not mention leave to amend, courts have discretion to grant a Rule 12(c) motion with leave to amend. *See Carmen v.*

*San Francisco Unified Sch. Dist.*, 982 F.Supp. 1396, 1401 (N.D. Cal. 1997).

Like a Rule 12(b)(6) motion to dismiss, a Rule 12(c) motion challenges the legal sufficiency of an opposing party's pleadings. "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). Dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (internal citations and quotations omitted). "While a complaint . . . does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitations of the elements of a cause of action will not do." *Id.* at 1964.

## IV. <u>ANALYSIS</u>

**A. Uncontested Aspects of Defendants' MJP.**

Plaintiffs did not contest certain aspects of Defendants' MJP in their opposition to the motion. In their objections to the F&Rs, Plaintiffs only object to the Magistrate Judge's conclusion that their Eighth Amendment claims should be dismissed because Defendants are entitled to qualified immunity from the claims. *See* Doc. 118 at 2-3. Plaintiffs, however, contest all of Defendants' objections.

Plaintiffs explicitly concede that their injunctive relief claim fails. *See* F&Rs at 24 ("Plaintiffs conceded at the hearing that they cannot receive injunctive relief on these individual capacity claims" against Defendants). Accordingly, the Court ADOPTS the Magistrate Judge's recommendation to GRANT WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs' claim for injunctive relief.

Plaintiffs also do not object to the Magistrate Judge's recommendation that the Court should grant with leave to amend Defendants' MJP on Plaintiffs' claims against Beard and Brazelton for lack of standing and subject matter jurisdiction because Plaintiffs contracted disseminated Valley Fever prior to Beard and Brazelton assuming their positions at PVSP and ASP. The Court ADOPTS the reasoning

underlying the Magistrate Judge's recommendation to grant Defendants' MJP on Plaintiffs' claims against Beard and Brazelton. The Court, however, finds that no leave to amend should be given because there is no reasonable possibility that Plaintiffs, who contracted disseminated Valley Fever before Beard and Brazelton assumed their respective positions, could state a claim against Beard or Brazelton. Accordingly, the Court GRANTS WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs' claims against Beard and Brazelton.[7]

Plaintiffs also do not dispute that their state law negligence claims should be dismissed because they failed to plead compliance with the California Tort Claims Act.[8] *See* Doc. 97 at 26; F&Rs at 52; *id.* at 52 n.17. Accordingly, the Court ADOPTS the Magistrate Judge's recommendation to GRANT WITH LEAVE TO AMEND Defendants' MJP on Plaintiffs' state law negligence claims.

Finally, Plaintiffs do not object to the Magistrate Judge's recommendation that their request to file the third amended complaint attached to their opposition to Defendants' MJP be denied and, instead, that they be granted an opportunity to file an amended complaint. Accordingly, the Court ADOPTS the Magistrate Judge's recommendation. As discussed in more detail below, Plaintiffs will have <u>one</u> more opportunity to file a further amended complaint.

---

[7] For the remainder of this Order, the Court's reference to "Defendants" is to Defendants Brown, Hartley, and Cate.

[8] The parties dispute whether Belton's state law negligence claims should be dismissed without leave to amend for failure to timely comply with the California Tort Claims Act. *See* F&Rs at 48-49; Doc. 120 at 12. California Government Code § 911.3(a) provides that if a public entity (here, the Victim Compensation and Government Claims Board ("the Board")) receives notice of a potential tort claim brought against it that the public entity believes is untimely, the public entity may notify the claimant that his/her claim is untimely. If the public entity elects to do so, "[t]he notice *shall* be in substantially" similar form to the three-paragraph sample provided in § 911.3(a). § 911.3(a) (emphasis added). Section 911.3(b) further provides that any timeliness defense "is waived by failure to give the notice set forth in" § 911.3(a). *See Kyles v. Baker*, 72 F. Supp. 3d 1021, 1047 (N.D. Cal. 2013) ("The reason that defendants have waived a timeliness defense here is that the notice sent to [the plaintiff] does not comply with section 911.3(a). The notice completely omits the second paragraph of the exemplary language provided in the statute."); *Phillips v. Desert Hosp. Dist.*, 49 Cal.3d 699, 705-06 ("Whether or not it decides to provide a notice of insufficiency, the public entity must notify the claimant within 45 days after the claim is presented whether the claim, defective or otherwise, was timely filed . . . . Failure to provide such notice of timeliness waives a public entity's defense base on untimeliness"); *Green v. State Ctr. Cmty. Coll. Dist.*, 34 Cal. App. 4th 1348, 1354 (1995) ("the filing of a claim for damages which fails to comply substantially with the [California Tort Claims] Act triggers a duty by the public entity to notify the potential claimant of the claim's insufficiency stating, with particularity, the defects or omissions. If the public entity fails to send this notice, it *waives* any defenses as to the sufficiency of the claim based upon a defect or omission." (emphasis in original)). The notice the Board provided to Belton only states, in relevant part, that Belton's "claim is accepted only to the extent that it was presented no later than six months after the accrual of the cause of action." Doc. 99-1 at 29. The notice is far from substantially similar to the language provided for in § 911.3(a). Accordingly, the Court ADOPTS the Magistrate Judge's finding that Defendants waived that defense because they failed to comply with Cal. Gov. Code § 911.3(a), and DENIES Defendants' MJP on Belton's state law negligence claim on the ground he failed to timely comply with the California Tort Claims Act.

**B. Plaintiffs' Standing.**

Defendants assert that none of the Plaintiffs have standing to assert claims against Governor Brown and only some, but not all of the Plaintiffs have standing to assert claims against Hartley. The Court must determine issues of standing before proceeding to the merits. *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

Governor Brown contends that the named Plaintiffs who contracted Valley Fever prior to his taking office in 2011 (Lujan, Taylor, and Belton) lack standing to assert their claims against him. *See* Doc. 120 at 7. Defendant Hartley asserts that Plaintiffs who were not housed at ASP (A. Jackson, M. Jackson, and L. Johnson), where Hartley was the warden, do not have standing to assert claims against him. *Id.*

**1. Standards.**

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III. *Pritikin v. Dep't of Energy*, 254 F.3d 791, 796 (9th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "To satisfy the Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1983). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To have standing, a plaintiff must show three elements.

First, the plaintiff must have suffered an "injury in fact" - an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted). The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter

on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id*. at 561; *see also Churchill Cnty. v. Babbitt*, 150 F.3d 1072, 1077 (9th Cir. 1998).

Standing is evaluated on a claim-by-claim basis. "A plaintiff must demonstrate standing 'for each claim he seeks to press' and for 'each form of relief sought.'" *Oregon v. Legal Servs. Corp.*, 552 F.3d 965, 969 (9th Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). "[S]tanding is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358, n. 6 (1996).

The actual-injury requirement would hardly serve the purpose ... of preventing courts from undertaking tasks assigned to the political branches [,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration.

*Id*. at 357. Standing is determined by the facts in existence at the time the complaint is filed. *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).

In the class action context,

The plaintiff class bears the burden of showing that the Article III standing requirements are met . . . . [S]tanding requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) the injury is "fairly traceable" to the challenged conduct, and (3) the injury is "likely" to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). Standing must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

*Bates*, 511 F.3d at 985.

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements." *Id*. (emphasis added). However, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (quotation marks and citation omitted). Accordingly, "if none of the named plaintiffs purporting

17

1    to represent a class establishes the requisite of a case or controversy with the defendants, none may seek

2    relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 493

3    (1974) (footnote omitted); *see also Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir. 2001), *abrogated on

4    other grounds by Johnson v. California*, 543 U.S. 499, 504-05 (2005).

5        **2. Analysis.**

6        As to Hartley, Defendants argue that Plaintiffs who were housed at PVSP—A. Jackson, M.

7    Jackson, and L. Johnson—cannot state any claim against Hartley because, according to the SAC's

8    allegations, Hartley was either the acting warden or warden of Avenal. As such, he necessarily had no

9    involvement with inmates at PVSP. The Court agrees that the PVSP inmates cannot state claims against

10   Hartley and therefore GRANTS WITHOUT LEAVE TO AMEND Defendants' MJP on any such

11   claims.

12       With respect to Governor Brown, Defendants argue that Plaintiffs cannot state a claim against

13   him because (1) Plaintiffs Lujan, Taylor, and Belton contracted Valley Fever before Governor Brown

14   became Governor in January 2011 and (2) the SAC fails to allege facts showing (a) any causal

15   connection between Governor Brown's conduct and Plaintiffs' injuries, or (b) that Governor Brown was

16   aware of the Valley Fever situation at PVSP and ASP.

17       The Court agrees with Defendants that Plaintiffs Lujan, Taylor, and Belton cannot state claims

18   against Governor Brown, as their injury—exposure to and contraction of Valley Fever—occurred in

19   2010, prior to Governor Brown's becoming Governor. Accordingly, the Court GRANTS WITHOUT

20   LEAVE TO AMEND Defendants' MJP on Plaintiffs Lujan, Taylor, and Belton's claims asserted against

21   Governor Brown.

22       Whether the remaining Plaintiffs can assert claims against Governor Brown is less clear. The

23   remaining Plaintiffs developed disseminated Valley Fever after Governor Brown assumed office in

24   January 2011 (M. Jackson and L. Johnson in October 2011; A. Jackson in January 2012; and N. Johnson

25   in July 2012). With the exception of A. Jackson, who allegedly was transferred to PVSP in July 2009,

26   and N. Johnson, who allegedly was transferred to ASP in May 2012, it is unclear when the remaining

Plaintiffs were housed in PVSP and/or ASP, the SAC only alleges when the remaining Plaintiffs were committed to the custody of the CDCR, but provides no facts as to when these Plaintiffs were housed at PVSP and/or ASP. SAC at ¶¶ 3, 5, 7, 9, 91, 96, 100, 103.

Because Plaintiffs' claims are premised on their injury being their *exposure* to conditions that presented an unreasonable risk of serious harm, it follows that their injury potentially accrued upon their arrival to PVSP or ASP. For instance, L. Johnson allegedly was committed to the custody of the CDCR in March 1992, and contracted disseminated Valley Fever in October 2011. If, however, he was housed in PVSP beginning in 2010, his injury pre-dates Governor Brown's assumption of office in January 2011. And if he was housed in PVSP beginning in 1992, his injury potentially accrued before any Defendant assumed his respective position. But L. Johnson did not contract disseminated Valley Fever until October 2011—approximately ten months after Governor Brown assumed office. Likewise, A. Jackson, M. Jackson, and N. Johnson contracted disseminated Valley Fever after Governor Brown assumed office. Accordingly, the Court finds that L. Johnson, A. Jackson, M. Jackson, and N. Johnson have standing to assert claims against Governor Brown because it is possible that their injuries accrued while Governor Brown was in office. Whether that in fact occurred is a question of fact properly left for determination at a later stage in the litigation.

In sum, all Plaintiffs have standing to assert claims against Cate, but none of them has standing to assert claims against Beard or Brazelton, who assumed their respective roles after Plaintiffs contracted disseminated Valley Fever. A. Jackson, M. Jackson, and L. Johnson do not have standing to assert claims against Hartley, as they were housed only in PVSP and Hartley was involved only with ASP. Taylor, Belton, Lujan, and N. Johnson, however, have standing to assert claims against Hartley. Lujan, Taylor, and Belton do not have standing to assert claims against Governor Brown, as they contracted disseminated Valley Fever prior to his assumption of office, though the other Plaintiffs do have standing to assert claims against Governor Brown as their injuries potentially accrued after his assumption of office. Accordingly, the following is an assessment of (1) all Plaintiffs' claims against Cate; (2) Belton, Lujan, N. Johnson, and Taylor's claims against Hartley; and (3) A. Jackson, M.

1  Jackson, E. Johnson, and N. Johnson's claims against Governor Brown.

2  **C. Plaintiffs' Eighth Amendment Claim.**

3      Plaintiffs assert Defendants violated their Eighth Amendment right to safe conditions of

4  confinement. Plaintiffs assert that Defendants exposed them to a substantial risk of serious harm with

5  deliberate indifference by (1) incarcerating them at PVSP and ASP, both of which are in areas that are

6  hyperendemic for Valley Fever and (2) knowingly refusing to take reasonable measures to (a) abate the

7  level of risk posed by Valley Fever at the prisons and (b) protect Plaintiffs from that risk. *See* SAC at ¶¶

8  121-23, 126; Doc. 118 at 13. Defendants argue that Plaintiffs cannot state an Eighth Amendment

9  conditions of confinement claim and, even if they could, Defendants are entitled to qualified immunity

10  from any such claim.

11      **1. The Eighth Amendment.**

12      Under the Eighth Amendment, "prison officials are . . . prohibited from being deliberately

13  indifferent to policies and practices that expose inmates to a substantial risk of serious harm." *Parsons v.*

14  *Ryan*, 754 F.3d 657, 677 (9th Cir. 2014); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993); *Farmer*

15  *v. Brennan*, 511 U.S. 825, 847 (1994) (prison official violates Eighth Amendment if he or she knows of

16  a substantial risk of serious harm to an inmate and fails to take reasonable measures to avoid the harm).

17  "Deliberate indifference occurs when '[an] official acted or failed to act despite his knowledge of a

18  substantial risk of serious harm.'" *Solis v. Cnty. of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008)

19  (emphasis added) (quoting *Farmer*, 511 U.S. at 841). Thus, a prisoner may state "a cause of action

20  under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference,

21  exposed him to [environmental conditions] that pose an unreasonable risk of serious damage to his

22  future health," *Helling*, 509 U.S. at 35.

23      "The second step, showing 'deliberate indifference,' involves a two part inquiry." *Thomas v.*

24  *Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). "First, the inmate must show that the prison officials were

25  aware of a 'substantial risk of serious harm' to an inmate's health or safety." *Id.* (quoting *Farmer*, 511

26  U.S. at 837). "This part of [the] inquiry may be satisfied if the inmate shows that the risk posed by the

1  deprivation is obvious.' *Id.* (citation omitted). "Second, the inmate must show that the prison officials

2  had no 'reasonable' justification for the deprivation, in spite of that risk." *Id.* (citing *Farmer*, 511 U.S. at

3  844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found

4  free from liability if they responded reasonably.") (footnote omitted).

5      **2. Qualified Immunity.**

6      "The doctrine of qualified immunity protects government officials 'from liability for civil

7  damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

8  which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011)

9  (en banc) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified immunity shields an

10  officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a

11  mistake based on mixed questions of law and fact." *Id.* (citation and quotation marks omitted). "The

12  purpose of qualified immunity is to strike a balance between the competing need to hold public officials

13  accountable when they exercise power irresponsibly and the need to shield officials from harassment,

14  distraction, and liability when they perform their duties reasonably." *Id.* (citation and quotation marks

15  omitted). Accordingly, qualified immunity "protects 'all but the plainly incompetent or those who

16  knowingly violate the law.'" *Ashcroft v. al–Kidd*, 563 U.S. 731, S.Ct. 2074, 2085 (2011) (citation

17  omitted). The party asserting the defense of qualified immunity bears the burden of proof. *See Gomez v.*

18  *Toledo*, 446 U.S. 635, 639-41 (1980).

19      In determining whether an official is entitled to qualified immunity, courts employ a two-

20  pronged inquiry. *Id.* The facts are construed in the light most favorable to the plaintiff. *Estate of Ford v.*

21  *Ramirez–Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). Courts are "permitted to exercise their sound

22  discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed

23  first in light of the circumstances in the particular case at hand." *Lal v. California*, 746 F.3d 1112, 1116

24  (9th Cir. 2014). First, a court must determine whether the official violated the plaintiff's constitutional

25  right. *Id.* If a constitutional violation is present, a court must then determine whether the constitutional

26  right was "clearly established in light of the specific context of the case" at the time of the events in

question. *Id.* (citation and quotation marks omitted); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—the critical question is whether the contours of the right were 'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Mattos*, 661 F.3d at 442 (quoting *al–Kidd*, 131 S.Ct. at 2083). "This inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition" *Saucier*, 533 U.S. at 202. "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *C.B. v. City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (citing *al–Kidd*, 131 S.Ct. at 2083).

However, "closely analogous preexisting case law is not required to show that a right was clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011) (internal citations and quotations omitted). While "there must be some parallel or comparable factual pattern[,] . . . the facts of already decided cases do not have to match precisely the facts with which [the government employer] is confronted." *Id.* Rather, the preexisting case law must have provided fair warning that the complained-of conduct was unlawful. *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136-37 (9th Cir. 2003) (citation omitted). "Ultimately, the 'clearly established' prong of the qualified immunity test shows deference towards the actions of government officials, but does not shield individuals who are 'plainly incompetent or those who knowingly violate the law.'" *Reza v. Pierce*, __ F.3d __, 2015 WL 4899122, at *7 (9th Cir. Aug. 18, 2015) (citation omitted).

**3. Analysis.**

Plaintiffs' Eighth Amendment claim concerns a heavily litigated but unresolved issue within this District: whether and under what circumstances inmates housed at prisons in the San Joaquin Valley, where Valley Fever spores are endemic, can state an Eighth Amendment claim premised on their involuntary exposure to Valley Fever spores and/or contraction of Valley Fever while incarcerated. The Court, however, declines to rule on that issue in this case because the second prong of the qualified immunity analysis—whether the constitutional right at issue in this case was "clearly established" at the

1   time Plaintiffs' alleged constitutional violations occurred—is dispositive. *See Zadeh*, 746 P.3d at 1116

2   (observing that courts may address only the second prong in the qualified immunity analysis).

3                    **a. The Constitutional Right at Issue.**

4           Although it is beyond dispute that Plaintiffs have a constitutional right to safe conditions of

5   confinement, *see generally Farmer*, 511 U.S. 825, the contours of that right are nuanced and the relevant

6   case law does not dictate unequivocally what the right at issue is in this case. The parties frame the at-

7   issue constitutional right differently. Plaintiffs frame the right as the "right of individual inmates and

8   groups of inmates who are known by prison officials to be specifically and dangerously vulnerable to a

9   particular risk to health or safety not to be unreasonably subjected by prison authorities to a 'substantial

10  risk of serious harm.'" Doc. 118 at 22 (quoting *Farmer*, 511 U.S. at 828) (citation and footnote omitted).

11  More generically, Plaintiffs define the right as "the right to be free from . . . the significantly increased

12  risk of a serious disease." Doc. 111 at 31:16-20; *see also* Doc. 97 at 19 (Plaintiffs arguing their

13  constitutional injury was being exposed "to a significantly increased risk of infection from a serious (and

14  sometimes fatal) disease"). Defendants, on the other hand, frame the constitutional right at issue as the

15  "right of an inmate to be free from the risk of exposure to naturally occurring [Valley Fever] fungal

16  spores." Doc. 121 at 5.

17          Neither party accurately frames the constitutional right at issue. Defendants misconstrue

18  Plaintiffs' allegations and, as a result, misconstrue the constitutional right at issue. Defendants

19  incorrectly frame the constitutional right asserted by Plaintiffs as the right to be entirely free from the

20  risk of exposure to cocci. *See id.*; *see also* Doc. 118 at 22 (Plaintiffs arguing "the clearly established

21  right that [the SAC] identifies is not a general right of all prison inmates to maximally safe conditions,

22  or even a right of all inmates not to be incarcerated in areas where Valley Fever is endemic").[9] But the

23  ―――――――――――――

24  [9] Although the SAC suggests that transferring Plaintiffs and other members of the proposed Plaintiff subclasses out of prisons
    in areas endemic for Valley Fever would have been appropriate, *see, e.g.*, SAC at ¶¶ 119, 126, Plaintiffs also assert
25  Defendants were deliberately indifferent to the risks posed by Valley Fever because they failed to take adequate
    remedial/preventative measures to reduce those risks. *See, e.g., id.* at ¶¶ 41, 44, 84, 66, 90, 109, 112, 160; *see also* Doc.
26  35:20-25, 44:1-6 ("these recommended remedial measures because the prison is a closed ground and if you take a look at it,
    there's this giant dirt field surrounding it. It gets dry, dust gets out, nobody's wearing masks when they're digging or when
    anything is going on, where there's no ventilation, there's no ability to have some type of filtration system").

1   crux of Plaintiffs' claim is that their being confined at PVSP and ASP has subjected them to colossally

2   elevated risks of contracting Valley Fever" that is far greater than elsewhere in California, including in

3   other hyperendemic locations, yet Defendants have failed to mitigate those risks by housing inmates at

4   PVSP and ASP *and* by failing to implement preventative/remedial measures to abate the inmates'

5   exposure to cocci at the prisons. *See* Doc. 111 at 47:10-15 ("And as we pled in our papers, we're talking

6   thousand times the risk here. That's a significantly increased risk . . . . The defendants knew about that

7   significantly increased risk and they didn't do something about it"); Doc. 97 at 19 ("This is not . . . a

8   complaint about simply being incarcerated in a region of California known to contain Valley Fever

9   spores."); *id.* at 22 (Plaintiffs arguing that the constitutional violation at issue here "was knowingly

10  exposing Plaintiffs and Class Members to significantly increased risks of harm from a serious disease");

11  *see also* SAC at ¶¶ 117-118, 120-122, 126. Thus, contrary to Defendants' assertions, Plaintiffs do not

12  claim a constitutional right to absolute freedom from exposure to Valley Fever.

13       On the other hand, Plaintiffs' iteration of the constitutional right at issue is overly broad.

14  Plaintiffs cannot simply assert, as they do here, that the right at issue here is to be free from Defendants

15  subjecting them to a substantial risk of serious harm from a disease with deliberate indifference. As the

16  Ninth Circuit explained in *Estate of Ford*,

17      the [Supreme] Court has emphasized that determining whether the law was clearly established
    'must be undertaken in light of the specific context of the case, not as a broad general

18      proposition.' *Saucier*, 533 U.S. at 201. Therefore, it is not sufficient that *Farmer* clearly states
    the general rule that prison officials cannot deliberately disregard a substantial risk of serious

19      harm to an inmate.

20  301 F.3d at 1050-51. In other words, the constitutional right at issue in this case must take into account

21  the specific Valley Fever context in which this case arose.

22       Although Plaintiffs' explicit iteration of the constitutional right at issue is overly broad, Plaintiffs

23  clearly argue in the SAC and their multiple briefs that Defendants violated their Eighth Amendment

24  rights by exposing them to dangerously high levels of cocci. As noted, however, the Court need not—

25  and does not—decide whether Plaintiffs have stated an Eighth Amendment claim because, as discussed

26  below, Defendants are entitled to qualified immunity from any such claim. However, to reach that

conclusion, the Court first must determine the constitutional right at issue in this case. In an effort to do so, the Court has reviewed binding precedent and persuasive authority from other courts. For the reasons discussed in more detail below, that case law informs the Court's conclusion that the constitutional right at issue here is the right of inmates to be free from jail officials unreasonably exposing them to an unreasonably high level of Valley Fever spores.

For example, although certain levels of environmental tobacco smoke ("ETS") will not harm some individuals, it could harm other individuals who are particularly sensitive to ETS (*e.g.*, those with asthma). *See Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007) ("A prison is not required to provide a completely smoke-free environment, except for prisoners who have asthma or some other serious respiratory condition that even a low level of ambient smoke would aggravate."). The right at issue in those cases is the right not to be exposed to an unreasonably dangerous level of ETS, which may be inmate-specific. *See id.* ("A normal prisoner must prove that he 'is being exposed to *unreasonably high levels* of ETS.") (quoting *Helling*, 509 U.S. at 35 (emphasis in original)).

In *Helling*, the plaintiff-inmate alleged that the defendants violated his Eighth Amendment rights by assigning him to a cell with another inmate who smoked five packs of cigarettes a day. 509 U.S. at 28. The plaintiff alleged that the defendants were deliberately indifferent to the health risks created by his cellmate's smoking, in violation of the Eighth Amendment. *Id.* The Supreme Court rejected the defendants' argument that the Eighth Amendment "does not protect against prison conditions that merely threaten to cause health problems in the future, no matter how grave and imminent the threat." *Id.* at 33. The Court explained:

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney*, 437 U.S. 678, 682 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33. The Court therefore held that an inmate "states a cause of action under the Eighth Amendment by alleging that [prison officials] have, with deliberate indifference, *exposed* him to levels of [environmental tobacco smoke ("ETS")] that pose an unreasonable risk of serious damage to his future health." *Id.* at 35 (emphasis added).

The Court held, however, that

> determining whether [the plaintiff's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36 (emphasis in original).

Since *Helling*, other courts have found that while a prison need not be entirely smoke-free for all prisoners, the Eighth Amendment is violated where a prisoner's health issues or a significantly high amount of ETS (or a combination of both) leads to an unreasonably high risk of harm. *See, e.g.*, *Whitley v. Hunt*, 158 F.3d 882, 888 (5th Cir. 1998); *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007); *see also Helling*, 509 U.S. 37 (Thomas, J., dissenting) ("Today the Court expands the Eighth Amendment in yet another direction, holding that it applies to a prisoner's mere *risk* of injury." (emphasis in original)). Conversely, courts have found that brief exposure to a low amount of ETS does not violate the Eighth Amendment. *See, e.g.*, *Richardson v. Spurlock*, 260 F.3d 495, 499-500 (5th Cir. 2001) (plaintiff "does not share living quarters with a smoker, nor does he work in a smoke-filled environment. He only alleges that he had to sit near some smokers during a bus ride on 'several occasions.' We do not believe that society considers this treatment to 'violate [] contemporary standards of decency.'" (quoting *Helling*, 509 U.S. at 37)); *Scott v. District of Columbia*, 139 F.3d 940, 943-44 (D.C. Cir. 1998) (reversing injunction requiring entirely smoke-free prison because prisoners have no Eighth Amendment right to entirely smoke-free environment and "prison officials were doing a good job keeping the environment reasonably smoke-free"); *Powers v. Snyder*, 484 F.3d 929, 932 (7th Cir. 2007) ("A prison is not required to provide a completely smoke-free environment, except for prisoners who have asthma

1   or some other serious respiratory condition that even a low level of ambient smoke would aggravate.").

2       Asbestos exposure cases follow largely the same logic. In *Wallis v. Baldwin*, 70 F.3d 1074, 1075

3   (9th Cir. 1995), the Ninth Circuit addressed the issue of whether an inmate's being required to clean

4   prison attics for 45 hours without any protection from exposed asbestos violated the Eighth Amendment.

5   The court found that it did. *Id.* at 1077. The court first observed that "[i]t is uncontroverted that asbestos

6   poses a serious risk to human health. *See, e.g.*, 20 U.S.C. §§ 3601(a)(3), 4011(a)(3) (noting the

7   Congressional finding that medical science has not established any minimum level of exposure to

8   asbestos considered safe)." *See also id.* (citing Or. Rev. Stat. § 283.415(1) ("There is no known safe

9   level for human exposure to asbestos.")). The court further found that the record established that the

10  defendants were aware of the risks of asbestos and were aware that the plaintiff would be unsafely

11  exposed to it. *Id.* Thus, the court held that the defendants acted with deliberate indifference, in violation

12  of the Eighth Amendment, by forcing the plaintiff (and other inmates) to clean the attics without

13  protective gear. *Id.*; *but see McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1994) ("Exposure to moderate

14  levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be

15  considered cruel and unusual."); *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (Eighth

16  Amendment only protects from exposure "to unreasonably high levels of environmental toxins," such as

17  asbestos (citing *Helling*, 509 U.S. 25)).

18      More recently, the Tenth Circuit addressed an inmate's allegation that prison officials knowingly

19  exposed him to asbestos dust in *Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009). The inmate-

20  plaintiff alleged that while installing a light fixture in a prison closet, another inmate removed pipes,

21  which filled the air with asbestos-containing dust. *Id.* at 1094. The plaintiff continued work on the closet

22  the next day and again was exposed to the asbestos-containing dust. *Id.* The plaintiff brought an Eighth

23  Amendment claim against various government officials, alleging that they were deliberately indifferent

24  to the risk of harm to him posed by requiring him to work on the prison closet when they knew it

25  contained asbestos, which the district court dismissed. *Id.* at 1105. The Tenth Circuit reversed the

26  district court's dismissal of the claim, holding that the plaintiff had stated an Eighth Amendment claim.

*Id.* at 485-86.

*Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005), concerned a scenario that is somewhat factually analogous case to the one presented by the Valley Fever situation at PVSP and ASP. In that case, two inmates brought an Eighth Amendment claim against various jail officials in which they asserted the jail's inadequate and unclean ventilation caused them significant health problems. *See id.* at 486. The plaintiffs alleged that the jail's "air flow system issued a constant flow of black fiberglass dust into the cells which caused [them] and other inmates to have countless nosebleeds." *Id.* at 473 (quotation marks omitted).

The plaintiffs provided testimony from a contractor who inspected the jail's ventilation system and found "a thick layer of dust and dirt inside the duct work," as well as "old-fashioned" black fiberglass duct liner. *Id.* at 474. The contractor opined that the jail "may be suffering from 'sick building syndrome,' as a result of the fiberglass and bacteria present in the ventilation system." *Id.* "He further testified as to the possibility that the ductwork contained black mold." *Id.* at 486 n.10. He recommended that the duct work be replaced "in order to cut down on the risk of disease," and if that could not be done immediately, then "the Jail, at least, needed to 'clean the entire ductwork system, not simply where the air comes out.'" *Id.* at 486.[10]

The Seventh Circuit affirmed the district court's decision that the plaintiffs had satisfied "the objective prong of the test for an Eighth Amendment violation." *Id.* at 487. The court reasoned:

> There is no question that exposing prisoners to conditions such as those described by the Boards "is contrary to current standards of decency." *Helling*, 509 U.S. at 35. In *Helling*, the Supreme Court went as far as to hold that exposure to [ETS], in certain circumstances, may very likely pose an objectively serious threat to future health sufficient to amount to cruel and unusual punishment. *Id.* at 32-36. This case does not pose nearly as close or abstract a question. The Boards have alleged direct physical manifestation of the harm caused by the poor ventilation, as well as the quite likely possibility for future health problems.

*Board*, 394 F.3d at 486. The Seventh Circuit further held that "there can be no question that the right to adequate and healthy ventilation was, and has been for some time, a clearly established constitutional

---

[10] The jail had "only tried to mask the symptoms of the problem by performing a flimsy, non-productive band-aid procedure of merely vacuuming the grates." *Board*, 394 F.3d at 486.

1  right at the time of [the plaintiff's] incarceration." *Id.* The court observed that "[f]or almost two decades

2  [the Seventh Circuit], as well as other circuit courts, have continually espoused a prisoner's right to

3  adequate ventilation," and the Supreme Court in *Helling* held "such a right is squarely rooted in Eighth

4  Amendment principles." *Id.* (citations omitted).

5      In 1985, for instance, the Ninth Circuit held that "[t]he lack of adequate ventilation and air flow

6  undermines the health of inmates and the sanitation of the penitentiary" in violation of the Eighth

7  Amendment. *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985). Citing *Hoptowit*, the Ninth

8  Circuit held in *Keenan v. Hall*, 83 F.3d 1083, 1090 (1996), that the inmate-plaintiff's testimony that the

9  prison was "saturated with the fumes of feces, urine, and vomit" created a genuine issue of material fact

10  as to whether the defendants violated his Eighth Amendment rights by exposing him to air that "could

11  undermine health and sanitation" inside the prison.

12      *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004), presents another factually analogous situation. In

13  that case, an inmate housed in a Mississippi penitentiary brought an Eighth Amendment claim

14  challenging a number of his conditions of confinement. *Id.* at 327. Among other things, the plaintiff

15  claimed his exposure to high temperatures and mosquitoes in his cell violated his Eighth Amendment

16  rights. *See id.* at 334. The district court observed that these issues were interrelated:

17      Relief from the heat can be obtained by keeping the windows open in the cell using fans. But
    keeping the windows open increases the mosquito population in the cells since there are holes in
18      the cell window screens and the screen gauge is not sufficient to keep mosquitoes out . . . . The
    heat problem also exacerbates the problem of pest control. Mosquitoes in Mississippi, and the
19      Delta in particular, are a problem that cannot be eliminated . . . . Inadequate screening on the cell
    windows causes the inmates to choose between suffering from the heat or increasing the
20      mosquitoes in their cells.

21  *Id.* The inmates often were forced to choose "between opening the window for relief from the heat or

22  closing the window for protection from mosquitoes, as the gauge on the screens is too large to out the

23  mosquitoes." *Id.* The district court further found that the mosquito problem was "linked to chronic sleep

24  deprivation, which exacerbates the symptoms of mental illness." *Id.* at 340. The district court held, and

25  the Fifth Circuit affirmed, however, that "the problem must be addressed and the impact lessened,

26  especially with the incidence of West Nile virus, a mosquito-born[e] disease increasing in Mississippi."

*Id.* at 334, 340. The Fifth Circuit therefore upheld the district court's injunction requiring the jail "to continue its efforts at pest control and, more specifically, to ensure that all cell windows are repaired and screened with 18 gauge window screen or better." *Id.* at 340.

In *Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001), the plaintiff-inmate alleged that the drinking water at the prison in which he was incarcerated for four years ("Stateville") contained radium. *Id.* at 471. The Illinois Environmental Protection Agency ("EPA") informed the plaintiff that Stateville's water contained radium almost twice maximum level set by the federal EPA. *Id.* at 472. The Illinois EPA further informed the plaintiff "that 80 other Illinois water systems had a similar problem (though how similar—that is, what the level of radium in those communities' water is—is not indicated)." *Id.* The Illinois EPA indicated that "no remedial action would be taken because the federal EPA was considering raising the maximum level . . . and at that level the concentration of radium in Stateville's water would be well below the maximum." *Id.*

The Seventh Circuit held the plaintiff did not have an Eighth Amendment claim based on the radium in Stateville's drinking water. *Id.* at 472. The court held that "failing to provide a maximally safe environment, one completely free from pollution or safety hazards," does not violate the Eighth Amendment. *Id.* The court reasoned that because "[m]any Americans live under conditions of exposure to various contaminants," inmates do not have an Eighth Amendment right to "more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Id.* (citations omitted). The court further reasoned that

> It would be inconsistent with this principle to impose upon prisons in the name of the
> Constitution a duty to take remedial measures against pollution or other contamination that the
> agencies responsible for the control of these hazards do not think require remedial measures. If
> the environmental authorities think there's no reason to do anything about a contaminant because
> its concentration is less than half the maximum in a proposed revision of the existing standards,
> prison officials cannot be faulted for not thinking it necessary for them to do anything either.
> They can defer to the superior expertise of those authorities.

*Id.* at 472-73. In other words, the radium level in Stateville's drinking water was not unreasonably

1  dangerous and, in any event, it was not Stateville's prerogative to remedy the problem.[11]

2      *Carroll* relied, in part, on *Givens v. Jones*, 900 F.2d 1229, 1234 (8th Cir. 1990). 255 F.3d at 472.

3  In *Givens*, the plaintiff-inmate claimed that construction at the prison in which he was incarcerated

4  violated his Eighth Amendment rights because the associated noise and fumes gave him migraines. 900

5  F.2d at 1234. The Eighth Circuit rejected his claim, reasoning that "[r]emodeling and upkeep of

6  institutions and buildings, in and out of prison, is a fact of life that must be faced by most individuals."

7  *Id.* In contrast, in *Kelley v. Borg*, 60 F.3d 664 (9th Cir. 1995), the Ninth Circuit held that an excessive

8  amount of fumes released into a prisoner's cell that rendered him unconscious violated his Eighth

9  Amendment rights.[12]

10     Finally, in *Graves v. Arpaio*, 623 F.3d 1043, 1049 (9th Cir. 2010), the Ninth Circuit affirmed the

11  district court's ordering a jail to house detainees taking psychotropic medications in locations that do not

12  exceed 85ºF because doing so "greatly increase[s] the risk of heat-related illness for pretrial detainees

13  taking psychotropic medications." The Ninth Circuit observed that because the "Eighth Amendment

14  requires that the temperature of the areas in which pre-trial detainees are held or housed does not

15  threaten their health or safety . . . it follows that the Eighth Amendment prohibits housing" detainees

16  taking psychotropic medications "in areas where the temperature exceeds 85ºF." *Id.* In other words, the

17  Eighth Amendment protects inmates from excessive heat that poses dangerous to their health, but, as

18  *Graves* illustrates, whether a certain level of heat is excessive may be inmate-specific.

19     These cases stand for the proposition that jail officials cannot, through affirmative or passive

20  conduct, unreasonably expose inmates to unreasonably unsafe levels of harmful human-made substances

21  or environmental hazards that pose serious health risks. In the Court's view, these cases clearly establish

22  that Plaintiffs have that *general* right. Prisons certainly need not be entirely free of everyday risks

---

23

24  [11] It is also unclear from the opinion in *Carroll* whether Stateville could have done anything to mitigate the problem of radium in its drinking water.

25  [12] *Kelley* was brought under the Eighth Amendment's mandate that prison officials cannot be deliberately indifferent to an inmate's serious medical needs. 60 F.3d at 667. But given that the plaintiff-inmate's Eighth Amendment claim existed "based on the passage of time from [his] first complaint [about the fumes] to the officers until the time that he lost consciousness,"

26  *id.* at 666,  it appears that the claim also could have been brought on a conditions of confinement theory.

(whether naturally occurring or human-made) that free citizens confront in the course of everyday life. *See, e.g.*, *Carroll*, 255 F.3d at 472; *Lane*, 16 F.3d at 125; *Givens*, 900 F.2d at 1234; *see also Sawyer v. Cole*, No. 3:10-cv-88-RCJ-WGC, 2012 WL 6210039, at *3 (D. Nev. Dec. 12, 2012), *aff'd*, 563 Fed. App'x 589 (9th Cir. 2014) (Eighth Amendment not violated by exposure to mold and fungus that did not cause plaintiff-inmate any illness). Yet prison officials cannot affirmatively place inmates at an unreasonably high risk of harm, nor can prison officials turn a blind eye to, or refuse to take reasonable steps to mitigate, those risks. *See, e.g.*, *Helling*, 509 U.S. at 35; *Wallis*, 70 F.3d at 1077; *Board*, 394 F.3d at 473; *Gates*, 376 F.3d at 340; *Smith*, 561 F.3d at 1105.

For instance, while inmates do not have an Eighth Amendment right to drinking water that is cleaner than that of the surrounding communities (particularly when the appropriate government agencies have not recommended remedial measures for the drinking water in those communities, *see Carroll*, 255 F.3d at 472-73), the Eighth Amendment does protect inmates from being required to drink unreasonably dangerous water. *See, e.g.*, *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (holding prisoner stated Eighth Amendment claim because, among other things, the prison's "drinking water contain[ed] small black worms which would eventually turn into small black flies"); *Robinson v. Page*, 170 F.3d 747, 747-49 (7th Cir. 1999) (holding inmate's allegations that prison officials knew that lead in the prison's drinking water caused (or would cause) him injury stated Eighth Amendment claim). Likewise, the Eighth Amendment does not require that inmates are housed in comfortable temperatures, but the Eighth Amendment does require that inmates are not housed at dangerously high temperatures. *Graves*, 623 F.3d at 1049. And while inmates do not have an Eighth Amendment right to air that is entirely free of environmental hazards, particularly when those environmental hazards are ones to which free citizens are exposed routinely, prison officials cannot unreasonably subject inmates to dangerous levels of airborne environmental hazards (whether naturally occurring or human-made) through their acts or omissions, nor can they decline to take reasonable measures to abate such hazards. *See Board*, 394 F.3d at 486; *Hoptowit*, 753 F.2d at 784; *Keenan*, 83 F.3d at 1090; *Smith*, 561 F.3d at 1094; *McNeil*, 16 F.3d at 125; *Wallis*, 70 F.3d at 1075-76; *Farmer*, 511 U.S. at 847.

In the qualified immunity context, however, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *al-Kidd*, 131 S.Ct. at 2084. Rather, "the right allegedly violated must be defined at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). As noted above, in the context of Valley Fever cases, the Court finds that the constitutional right at issue is the right of inmates to be free from jail officials unreasonably exposing them to an unreasonably high level of cocci.

Although a majority of those infected with Valley Fever show no symptoms and the minority of those who do exhibit symptoms only exhibit minor symptoms, exposure to and inhalation of cocci necessarily presents *some* health risk to everyone. Thus, the Court finds that the level of exposure to cocci, as opposed to the level of risk of contraction of disseminated Valley Fever, is the appropriate inquiry here. Whether an inmate's complained-of exposure to cocci violates the Eighth Amendment therefore requires an assessment of (1) the level of exposure; (2) the health risks presented by that exposure; (3) whether that exposure is a risk society is willing to tolerate; (4) whether the appropriate prison officials know of and understand the health risks posed by that exposure; and (5) the reasonableness of the prison officials' response to those risks, if any.[13] If certain groups are more susceptible to contracting the disease, or are more susceptible to contracting the disseminated form of the disease, then that should be taken into account when assessing whether the complained-of exposure is unreasonably dangerous.[14] And to determine whether the risk posed is one society is willing to

---

[13] This conclusion is informed primarily by *Farmer*, 511 U.S. at 848, and *Helling*, 509 U.S. at 36. *Farmer* framed the first, objective prong of its two-part deliberate indifferent analysis applied to conditions of confinement claims as the "substantial *risk* of serious harm," and framed the second, subjective prong of the analysis as asking whether the appropriate prison official knows that an inmate faces such a risk and, if so, whether that prison official undertook reasonable measures to abate that risk. 511 U.S. at 848. *Helling* further mandates that courts "assess whether society considers the *risk* that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwilling to such a risk." 509 U.S. at 36 (first emphasis added); *see also Wallis*, 70 F.3d at 1075-76 (holding that plaintiff-inmate stated Eighth Amendment claim based on exposure to asbestos even though he did not allege any resultant harm from that exposure).

[14] Another uncertain aspect of Valley Fever cases is whether the risk of contracting "normal" Valley Fever, which generally results in only minor flu-like symptoms, is a sufficiently serious risk of harm for Eighth Amendment purposes, or whether the risk of contracting the disseminated form of the disease is the only risk that triggers Eighth Amendment scrutiny. *See, e.g.*, *Cruz v. Schwarzenegger*, No. 1:08-cv-352-OWW-SMS PC, 2008 WL 4330466, at *2 (E.D. Cal. Sept. 19, 2008) ("The facts that there is a risk of developing Valley Fever if confined at Pleasant Valley State Prison and that Plaintiff contracted Valley Fever are insufficient to support a claim for violation of the Eighth Amendment. The risk of serious harm to Plaintiff's health or safety had to have been *substantial*"); *Gaona v. Yates*, No. 09cv-999-SKO PC, 2010 WL 2843163, at *3 (E.D. Cal. July 19, 2010) ("The risk of contracting flu-like symptoms is not the type of 'sufficiently serious,' wanton and unnecessary

1   tolerate, the Court must assess whether the complained-of exposure to cocci and the resultant incidence

2   rates of Valley Fever are similar to those of other communities where cocci are endemic. *See Carroll*,

3   255 F.3d 470; *Hines v. Youssef*, No. 1:13-cv-357-AWI-JLT, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13,

4   2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of

5   exposure substantially above the risk experienced by the surrounding communities, it cannot be

6   reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate.").

7       Ultimately, however, the Court need not determine the full contours of the Eighth Amendment in

8   the Valley Fever context and whether Plaintiffs have pled a violation of their Eighth Amendment rights

9   sufficiently. As discussed below, the Court finds that Defendants are entitled to qualified immunity from

10  Plaintiffs' Eighth Amendment claim because, even assuming Plaintiffs have alleged an Eighth

11  Amendment violation, the constitutional right at issue was not clearly established at all relevant times.

12              **b. The Constitutional Right at Issue Has Never Been Clearly Established.**

13      The second prong of the qualified immunity analysis requires the Court to determine whether the

14  allegedly violated constitutional right was clearly established at the time that Defendants allegedly

15  violated that right. *Mattos*, 661 F.3d at 442. The circumstances in which an inmate's exposure to cocci

16  while incarcerated may support an Eighth Amendment claim are not clear. As the F&Rs correctly

17  recognized, no binding Supreme Court or Ninth Circuit precedent squarely addresses the issue. Doc. 106

18  at 30. The Ninth Circuit has touched on the issue only in brief, undeveloped, and unpublished

19  memorandum decisions.

20      Defendants seemingly argue that Plaintiffs' rights were first violated when Plaintiffs contracted

21  Valley Fever. *See* Doc. 121 at 5 ("Given the status of district courts' decisional law at the time Plaintiffs

22  allegedly contracted valley fever, Defendants are entitled to qualified immunity at the pleading stage.")

23  (citation omitted). Plaintiffs, on the other hand, do not clearly provide a point at which they believe their

24

25  ─────────────────────────────────────

26  infliction of pain that is prohibited by the Eighth Amendment."); *Lua v. Smith*, No. 1:14-cv-19-LJO-MJS, 2014 WL 1308605, at *3 (E.D. Cal. Mar. 31, 2014) ("Courts have deemed the first prong of an Eighth Amendment claim satisfied where the plaintiff has identified a factor responsible for either increasing the risk of contraction or the severity of infection." (collecting cases)). However, the Court need not and does not rule on that issue.

1   constitutional rights at issue were first implicated.

2   As noted, although the SAC provides dates on which Plaintiffs developed disseminated Valley

3   Fever while incarcerated at PVSP and/or ASP, *see id.* at ¶¶ 3-9, the SAC only states when two Plaintiffs,

4   A. Jackson and N. Johnson, were committed to PVSP or ASP—Jackson was transferred to PVSP in July

5   2009, and N. Johnson was transferred to ASP in May 2012. *See id.* at ¶¶ 91, 103. The SAC does not

6   state when the other Plaintiffs were incarcerated in PVSP and/or ASP. *See id.* at ¶¶ 91-104.

7   This case, however, is brought on behalf of various inmates housed at PVSP or ASP at any time

8   from July 8, 2009, to the present. SAC at ¶ 20. It is questionable whether July 2009 is the appropriate

9   starting point for the qualified immunity analysis due to the uncertainties in the record, namely, the lack

10  of clarity in the record concerning when Plaintiffs were housed at PVSP and/or ASP. It is difficult, for

11  instance, to conclude that the inquiry appropriately begins in July 2009 when N. Johnson apparently was

12  not incarcerated at either PVSP or ASP until May 2012.

13  Nonetheless, the Court's conclusion below that Defendants are entitled to qualified immunity

14  would not be affected by looking at the state of the law at a time later than July 8, 2009. Regardless of

15  whether the Court looked only to the state of the law as it existed in July 2009 or as it exists today, the

16  Court would still conclude that the right at issue was not clearly established. *See Jones v. Hartley*, No.

17  1:13-cv-1590-AWI-GSA-PC, 2015 WL 1276708, at *2-3 (E.D. Cal. Mar. 19, 2015) (collecting cases);

18  *Smith*, 2015 WL 3953367, at *3 (recognizing contrary conclusions in Valley Fever cases within this

19  district). Thus, even if the Court looked at the state of the law at the earliest possible time (*i.e.*, July

20  2009) or at the latest possible time (*i.e.*, today), the Court's conclusion that Defendants are entitled to

21  qualified immunity would be the same. *See Reza*, 2015 WL 4899122, at *7 (assessing state of law on

22  date on which the plaintiff allegedly was arrested unlawfully).

23  In *Smith v. Schwarzenegger*, No. CV 1-07-1547-SRB, 2009 WL 900654, at *1 (E.D. Cal. Mar.

24  31, 2009), *rev'd*, 393 Fed. App'x 518 (9th Cir. 2010), the plaintiff brought, among other claims, an

25  Eighth Amendment claim asserting his right to be free from cruel and unusual punishment. In that claim,

26  the plaintiff alleged that he was held in Kern Valley State Prison ("KVSP"), which is "located in the San

Joaquin Valley where he is subjected to the risk of contracting valley fever, in violation of the Eighth Amendment." *Smith*, 2009 WL 900654, at *1. The plaintiff alleged that his being housing at KVSP posed an unconstitutional threat to his health and safety. *Smith*, No. CV 1-7-1547-SRB, Doc. 21 at 7 ("Myself and other inmates . . . in California State Prisoners located in the San Joaquin Valley . . . are being forcibly subjected to contracting . . . Valley Fever"). The plaintiff also alleged that African-Americans, such as himself, and other ethnic groups "are extremely susceptible to contracting Valley Fever." *Id.*

Notably, the plaintiff did not allege that he had contracted Valley Fever; he only alleged that he "*may have contracted* Valley Fever but will not know for" many years if he contracted the disease. *Id.* (emphasis added). The plaintiff further alleged that the defendants "have failed to act to remove [him] . . . out of the endemic area where . . . inmates have been infected by Valley Fever and have [died] from Valley Fever." *Id.* at 10. Thus, the plaintiff claimed that his Eighth Amendment rights had been violated "not only by possible present harm but by possible future harm, arising out of exposure to San Joaquin Valley Fever" and the defendants' failure to remove inmates from prisons located in areas endemic to Valley Fever. *Id.* at 10-15.

Visiting District Judge Bolton found that:

> Plaintiff has failed to show that any of the named Defendants were deliberately indifferent to a serious risk of harm to Plaintiff's health. Plaintiff does not allege that Defendants were aware of a particular threat to Plaintiff's health or that Plaintiff has been harmed as the result of Defendants' actions or failure to act. Plaintiff alleges only that Defendants are aware of the general presence of valley fever in the areas in which Plaintiff is housed and that Plaintiff may contract valley fever. This is insufficient to establish an Eighth Amendment violation.

*Smith*, 2009 WL 900654, at *2. Accordingly, the claim was dismissed with prejudice. *Id.*

On appeal, the Ninth Circuit reversed in an unpublished, one-page memorandum decision. *Smith v. Schwarzenegger*, 393 Fed. App'x 518, 519 (9th Cir. 2010). The Ninth Circuit observed the district court dismissed the claim "because it determined that [the plaintiff] failed to allege facts demonstrating that the defendants were deliberately indifferent to a serious risk to his health." *Id.* The court held that "[i]n dismissing with prejudice, the district court erred because it is not beyond doubt that [the plaintiff] could prove no set of facts in support of his claims that would entitled [*sic*] him to relief." *Id.* (citing

*Helling*, 509 U.S. at 25 (a prisoner "states a cause of action under the Eighth Amendment by alleging that [defendants] have, with deliberate indifference, exposed him to levels of [environmental tobacco smoke] that pose an unreasonable risk of serious damage to his future health")). The Ninth Circuit therefore vacated and remanded the case "with instructions to allow [the plaintiff] the opportunity to amend his complaint to allege facts demonstrating that the defendants are aware of a substantial risk to [his] health and have not taken action to prevent or minimize that risk." *Id.*[15]

Similarly, the Ninth Circuit reversed this Court with a one-page decision in *Johnson v. Pleasant Valley State Prison*, 505 Fed. App'x 631 (9th Cir. 2013). In *Johnson*, the plaintiff brought one claim under § 1983 in which he alleged that his exposure to and contraction of Valley Fever while at PVSP violated his Eighth Amendment rights. *Johnson*, 2012 WL 1297380, at *1. The Magistrate Judge issued F&Rs screening the complaint and summarized the plaintiff's allegations in part, as follows:

> Plaintiff . . . is incarcerated at [PVSP], and brings this action against Defendants . . . alleging deliberate indifference in violation of the Eighth Amendment. Shortly after being transferred to PVSP on August 20, 2010, Plaintiff began experiencing flu-like symptoms and was eventually diagnosed with Valley Fever. Plaintiff alleges that Defendants were aware through CDCR memorandums that PVSP and seven other facilities were constructed in "hyperendemic" areas. Defendants allegedly have ignored a threat to Plaintiff, and every other prisoner who is housed at PVSP, by placing them where they are exposed to "environmental hazards" in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

---

[15] On remand, the plaintiff filed a fourth amended complaint against Cate, James Yates, the former warden of PVSP, Jeanne Woodford, the former Secretary of CDCR, and "John Doe Appeals Coordinator," among other defendants. *See Smith*, No. 1:07-cv-1547-SRB, Doc. 65 at 1. Judge Bolton summarized the allegations underlying that claim as follows:

> Plaintiff alleges that his Eighth Amendment rights were violated when he was housed in an area with a known valley fever epidemic. Plaintiff alleges that he is particularly susceptible to valley fever because he is African-American and has tuberculosis and hepatitis C. Plaintiff further states that he was recently informed that he has now contracted valley fever and that because of his hepatitis C, he cannot take the valley fever medication. Plaintiff claims that Defendants were aware of the severe risk to his health that results from housing him in this area, but failed to transfer him to another facility . . . .

> Plaintiff claims that Defendants Cate and Woodford violated his Eighth Amendment rights when they failed to develop policies for moving high risk inmates, such as Plaintiff, out of prisons located in areas known to have high incidences of valley fever. Plaintiff further claims that while housed at the Pleasant Valley State Prison, he filed a grievance regarding his susceptibility to valley fever and requesting a transfer, but that Defendant Appeals Coordinator was deliberately indifferent to a risk to Plaintiff's health when he informed Plaintiff that he would not process the grievance unless Plaintiff had already contracted valley fever. Plaintiff claims that Defendant Appeals Coordinator's refusal to process the grievance hindered his ability to grieve the issue at any of his later housing assignments. Finally, Plaintiff claims that Defendant Yates was aware of the risk of Plaintiff contracting valley fever, but did not transfer him, and that Defendant Yates developed a policy requiring Plaintiff to "contract valley fever before he can receive relief from exposure to valley fever."

*Id.* at 3, 6. Judge Bolton found that these allegations, "[v]ery liberally construed . . . adequately stated Eighth Amendment claims against Defendants Cate, Woodford, Yates, and John Doe Appeals Coordinator." *Id.* at 6.

*Id.* The Magistrate Judge found that the plaintiff failed to state a claim under the Eighth Amendment, reasoning:

> To state a claim that the presence or prevalence of Valley Fever at PVSP constituted a danger to Plaintiff's health, Plaintiff must allege facts sufficient to support a claim that prison officials knew of and disregarded a substantial risk of serious harm to him . . . . Even if the risk of contracting Valley Fever is higher at PVSP than in other areas of the state, the Court declines to find that, due to its location, the prison itself constitutes a substantial risk of harm to inmates . . . There is no support for such a sweeping proposition, and the Court finds that Plaintiff's Eighth Amendment claim arising from the mere fact that he is being housed at PVSP is not cognizable under section 1983.

*Id.* at *3 (citations omitted).

Plaintiff filed objections to the F&Rs. *Id.* at Doc. 14. Citing *Farmer*, 511 U.S. 825, and *Helling*, 509 U.S. 25, the plaintiff argued that the defendants exhibited deliberate indifference to him by placing him at an excessive risk of contracting Valley Fever while incarcerated at PVSP. *Id.* at 2-3. This Court adopted the Magistrate Judge's F&Rs in full and dismissed the plaintiff's sole Eighth Amendment claim. *See* No. 1:11-CV-191-LJO-BAM PC, *Johnson v. Pleasant Valley State Prison*, Doc. 15.

The Ninth Circuit reversed, holding that

> dismissal of [the plaintiff's] action was improper at this early stage because [the plaintiff] alleged that prison officials were aware that inmates' exposure to valley fever posed a significant threat to inmate safety yet failed to take reasonable measures to avoid that threat . . . . *Farmer v. Brennan*, 511 U.S. 825, 847 (1994) (a prison official violates the Eighth Amendment prohibition against inhumane conditions of confinement if he or she knows of a substantial risk of serious harm to an inmate and fails to take reasonable measures to avoid the harm).

*Johnson*, 505 Fed. App'x at 632.

In *Johnson*, the Ninth Circuit "express[ed] no opinion as to the sufficiency or merit of [the plaintiff's] allegations." *Id.* And, as the F&Rs observed, the Ninth Circuit in *Smith* provided "no discussion of what would be required to state a claim under the Eighth Amendment." Doc. 106 at 30 n.6; *Smith*, 393 Fed. App'x at 519. Accordingly, the Court finds that *Johnson* and *Smith* do not clearly establish the right at issue in this case, particularly given that it is a "rare instance in which, absent any published opinions on point or overwhelming obviousness of illegality, [a court] can conclude that the law was clearly established on the basis of unpublished decisions only." *Sorrels v. McKee*, 290 F.3d

In the absence of controlling authority, a defendant nonetheless may not be entitled to qualified immunity if the illegality of the defendant's conduct was overwhelmingly obvious, *id.*, or "a consensus of cases of persuasive authority" would have put the defendant on notice that his/her conduct was unlawful. *Wilson v. Layne*, 526 U.S. 603, 617 (1999). The F&Rs contain a thorough review of Valley Fever cases in this district. *See* F&Rs at 40-42. Simply put, those cases show that there has been longstanding disagreement among the judges of this district as to whether and under what circumstances inmates housed at prisons in the San Joaquin Valley, where Valley Fever is endemic, may state an Eighth Amendment claim for being exposed to Valley Fever spores while incarcerated. *See id.*

This disagreement has led to diametrically opposed conclusions at times. Critically, judges have disagreed as to whether allegations that an inmate's ethnicity increases the risk of contracting Valley Fever and developing disseminating Valley Fever states an Eighth Amendment claim.[17] Similarly,

---

[16] This conclusion is further reinforced by the Ninth Circuit's decision in *Holley v. Scott*, 576 Fed. App'x 670 (9th Cir. 2014), another one-page memorandum decision addressing an Eighth Amendment claim premised on the plaintiff-inmate's exposure to Valley Fever spores while incarcerated. In that case, the Magistrate Judge screened the plaintiff's second amended complaint, which alleged an Eighth Amendment claim based on his exposure to Valley Fever spores while incarcerated at PVSP, and dismissed the claim without leave to amend. *Holley v. Scott*, No. 1:12-cv-1090-MJS (PC), 2013 WL 3992129, at *5 (E.D. Cal. Aug. 1, 2013). The plaintiff alleged that he was an African-American at medically high risk of contracting Valley Fever because of his race and health status. *Id.* at *1. The Magistrate Judge found that the plaintiff failed to allege facts demonstrating that the defendants acted with deliberate indifference because the plaintiff did not allege that the defendants were aware of the risks posed by Valley Fever spores at PVSP. *Id.* at *5. On appeal, the Ninth Circuit affirmed. *Holley*, 576 Fed. App'x at 670 (citing *Farmer*, 511 U.S. at 837). Although *Smith* and *Johnson* involved materially similar allegations, the Ninth Circuit's reversals in those cases perhaps can be explained by the fact that they involved original complaints dismissed without leave to amend, whereas *Holley* involved a second amended complaint filed after the Magistrate Judge had "twice previously instructed Plaintiff on the legal standard and given him opportunity to allege facts which meet it," yet the second amended complaint failed to do so. *Holley*, 2013 WL 3992129, at *5. In addition, the plaintiff in *Holley* had satisfied the first, objective prong of his Eighth Amendment claim, but had failed on the second, subjective prong of the claim. *See id.* at *4-5; *Holley*, Fed. App'x at 670 ("The district court properly dismissed Holley's action because Holley failed to allege facts showing that defendants were deliberately indifferent to a risk of Holley contracting Valley Fever by housing him at Pleasant Valley State Prison.") (citation omitted).

[17] *Compare, e.g.*, *Smith v. California*, No. 1:13-cv-869-AWI-SKO (PC), 2015 WL 3953367, at *3 (E.D. Cal. June 29, 2015) (African-American civil detainee in CSH with numerous health issues that "place[d] him at high risk for contracting Valley Fever" could not state conditions of confinement claim under either Eighth Amendment deliberate indifference or lower "professional judgment" standard premised on exposure to Valley Fever spores while at CSH); *Smith v. Brown*, No. 1:12-cv-238-AWI-JLT (PC), 2012 WL 1574651, at *3-4 (E.D. Cal. May 3, 2012) (holding that African-American plaintiff's allegations that he was exposed to Valley Fever while incarcerated and African-Americans are more susceptible to Valley Fever were insufficient to state Eighth Amendment claim); *Clark v. Igbinosa*, No. 1:10-cv-1336-DLB PC, 2011 WL 1043868, at *2 (E.D. Cal. Mar. 21, 2011) (same); *James v. Yates*, No. 1:08-cv-1706-DLB PC, 2010 WL 2465407, at *3-4 (E.D. Cal. June 15, 2010) (same); *Moreno v. Yates*, No. 1:07-cv-1404-DGC, Doc. 1 at 9-10, 2010 WL 1223131, at *2 (E.D. Cal. Mar. 24, 2010) (granting summary judgment against plaintiff-inmate who contracted Valley Fever at PVSP and who alleged certain racial groups are more susceptible to developing disseminating Valley Fever because "society plainly tolerates the health risks" posed by Valley Fever at PVSP); *King v. Avenal State Prison*, No. 1:07-cv-1283-AWI-GSA (PC), 2009 WL

judges have disagreed as to whether an inmate's allegations that medical conditions increase the risk of contracting Valley Fever and developing disseminated Valley Fever states an Eighth Amendment claim.[18] Notably, Plaintiffs acknowledge both of these instances of disagreement. *See* Doc. 118 at 31-32.

Given this obvious, legitimate, and reasonable disagreement, the Court finds that Defendants are entitled to qualified immunity from Plaintiffs' Eighth Amendment claim. Even assuming Defendants' conduct was unlawful—an issue which the Court need not and does not decide—the disagreement among the judges of this district with regard to Valley Fever cases brought by inmates in San Joaquin Valley prisons establishes that the right at issue here was not sufficiently clear such that Defendants had "'fair warning' that their conduct was unlawful." *Flores*, 324 F.3d at 1137. "If judges thus disagree on a constitutional question, it is unfair to subject [public officials] to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S. at 618; *see also Bahrampour v. Lampert*, 356 F.3d 969, 977 (9th Cir. 2004) ("The fact that there was a conflict in the views of district court judges on the issue

---

546212, at *4 (E.D. Cal. Mar. 4, 2009) ("[N]o courts have held that exposure to Valley Fever spores presents an excessive risk to inmate health") *with, e.g.*, *Chaney v. Beard*, No. 1:14-cv-369-MJS, 2014 WL 2957469, at *3 (E.D. Cal. June 30, 2014) ("Plaintiff alleges that he is an African American male and is therefore at an increased risk of harm from Valley Fever. This is sufficient to satisfy the first element of Plaintiff's Eighth Amendment claim.").

[18] *Compare, e.g.*, *Moreno v. Yates*, No. 1:07-cv-1404-DGC, 2010 WL 1223131, at *2 (E.D. Cal. Mar. 24, 2010) (granting summary judgment against plaintiff-inmate because "society plainly tolerates the health risks" posed by Valley Fever at PVSP); *Gilbert v. Yates*, No. 1:09-cv-2050-AWI-DLB, 2010 WL 5113116, at *1, 3 (E.D. Cal. Dec. 9, 2010) (plaintiff with asthma, pulmonary conditions, and hepatitis C who contracted Valley Fever while incarcerated at PVSP did not state Eighth Amendment claim), *aff'd*, 479 Fed. App'x 93 (9th Cir. 2012); *Schroeder v. Yates*, No. 1:10-cv-433-OWW-GSA PC, 2011 WL 23094, at *1 (E.D. Cal. Jan. 4, 2011) (inmate with emphysema and chronic obstructive pulmonary disease could not state claim for exposure to Valley Fever spores while incarcerated at PVSP); *Ayala v. Yates*, No. 1:10-cv-50-MJS (PC), 2011 WL 4527464, at *3 (E.D. Cal. Sept. 28, 2011) ("Exposure to [Valley Fever] at PVSP is not in and of itself an excessive risk to inmate health; Defendants had no duty to take steps to reduce the risk."); *Miller v. Brown*, No. 1:12-cv-1589-LJO-BAM PC, 2013 WL 6712575, at *6 (E.D. Cal. Dec. 18, 2013) (dismissing inmate's Eighth Amendment claim, in part, because he did not "indicate if he in fact contracted Valley Fever"); *with, e.g.*, *Whitney v. Walker*, No. 1:10-cv-1963 DLB PC, 2012 WL 893783, at *4 (E.D. Cal. Mar. 15, 2012) (plaintiff's allegation that his immune system was compromised by cancer stated Eighth Amendment claim for contraction of Valley Fever while incarcerated at ASP); *Owens v. Trimble*, No. 1:11-cv-1540-LJO-MJS (PC), 2012 WL 1910102, at *2 (E.D. Cal. May 25, 2012) ("Plaintiff has alleged that his asthma increases the risk of infection [of Valley Fever] and thus satisfies the first element of his Eighth Amendment claim."); *Sparkman v. Calif. Dep't of Corrections and Rehab.*, No. 1:12-cv-1444-AWI-MJS (PC), 2013 WL 1326218, at *3 (E.D. Cal. Mar. 29, 2013) ("Exposure to Valley Fever with such a preexisting lung condition is also a serious medical condition sufficient to satisfy the first prong of an Eighth Amendment claim based on Valley Fever exposure.") (citations omitted); *Wood v. Brown*, No. 1:11-cv-1846-RRB, 2013 WL 1759099, at *2 (E.D. Cal. Apr. 24, 2013) (holding that inmate could potentially state Eighth Amendment claim for being transferred to ASP where he contracted Valley Fever if officials responsible for transfer were properly named); *see also Beagle v. Schwarzenegger*, __ F.3d __, 2014 WL 9866913, at *10 (E.D. Cal. 2014) (disagreeing with findings and recommendations and holding that inmates "need not demonstrate that they are at a higher risk of contracting Valley Fever or a more severe form of the disease to state an Eighth Amendment claim"); F&Rs at 14 (finding that Plaintiffs stated Eighth Amendment claim against Governor Brown); *see also Borquez v. Arpaio*, No. CV 07-226-PHX-DGC (JCG), 2007 WL 625925, at *3 (D. Ariz. Feb. 26, 2007) (holding that plaintiff-inmate's allegation "that he has been exposed to asbestos and valley fever" while incarcerated failed to state Eighth Amendment claim).

1   demonstrates that the constitutionality of the regulations was not clearly established.) Further, because

2   of this disagreement, the Court cannot find that Defendants' conduct was obviously illegal (much less

3   overwhelmingly so) because "[t]he state of the law was at best undeveloped." *Wilson*, 526 U.S. at 617.[19]

4   Accordingly, the Court GRANTS Defendants' MJP on Plaintiffs' Eighth Amendment claim because

5   Defendants have established that they are entitled to qualified immunity from the claim.

6   **D. Plaintiffs' Racial Discrimination Claims.**

7       **2. Whether the Racial Discrimination Claims State a Valid Claim.**

8       The parties refer to Plaintiffs' second, third, and fourth causes of action, which are brought only

9   by proposed Plaintiff subclass 1 (African-Americans), as Plaintiffs' "racial discrimination claims."[20] The

10  second and third claims, brought under § 1983, assert that Defendants discriminated against Plaintiffs on

11  account of their race, in violation of Plaintiffs' constitutional right to equal protection under the

12  Fourteenth Amendment. *See* SAC at ¶¶ 129, 146. Plaintiffs' fourth cause of action asserts that

13  Defendants intentionally discriminated against Plaintiffs in violation of § 1981 in that they "were

14  subjected to punishment unlike that subject to white citizens." *Id.* at ¶¶ 157-58.[21] Defendants assert they

15  are entitled to qualified immunity from the claims. *See* Doc. 89-2 at 19; Doc. 120 at 8.

16      The parties do not distinguish these claims meaningfully; rather, the parties only provide broad

17  arguments that apply to all three causes of action. *See, e.g.*, Doc. 89-2 at 8-11; Doc. 120 at 8-11; Doc.

18  124 at 14-19. In arguing whether Defendants are entitled to qualified immunity from the claims, neither

19

20  [19] In dismissing Plaintiffs' original complaint, the Court adopted the Magistrate Judge's finding that Defendants were not entitled to qualified immunity from Plaintiffs' Eighth Amendment claim. *See* Doc. 41 at 3. The Court agrees with the Magistrate Judge's conclusion in the F&Rs that that holding was clearly erroneous. *See* Doc. 106 at 25. Further, the Court

21  finds that following that conclusion as law of the case would work a manifest injustice. The Court notes that a visiting district judge, relying on this Court's prior order in this case, recently found that former Governor Schwarzenegger and various PVSP and ASP officials were not entitled to qualified immunity from an African-American plaintiff's claim that his

22  contracting Valley Fever while housed at PVSP violated his Eighth Amendment rights. *See Smith v. Schwarzenegger*, No. 07-cv-1547 SRB (PC), 2015 WL 106337, at *2 (E.D. Cal. Jan. 7, 2015). This further reinforces the Court's conclusion that

23  the unsettled state of the law pertaining to Valley Fever cases within this district entitles Defendants to qualified immunity from Plaintiffs' Eighth Amendment claim.

24  [20] The Court's reference to "Plaintiffs" in this section refers only to members of proposed Plaintiff subclass 1.

25  [21] "In the alternative, Plaintiffs and the Plaintiff Class bring this Cause of Action under the Right to Make and Enforce Contracts, one of the distinct enumerated rights provided for under 42 U.S.C. § 1981." SAC at ¶ 164. Defendants' MJP does

26  not address this aspect of Plaintiffs' fourth cause of action, and neither party has briefed the issue, presumably because the Court previously dismissed this portion of Plaintiffs' § 1981 *without* leave to amend. Accordingly, the Court need not and will not address the issue.

party clearly delineates the constitutional right(s) at issue, nor do they clearly and adequately discuss the corresponding standards and relevant underlying precedent.

Plaintiffs' racial discrimination claims are premised on essentially the same facts that underlie their Eighth Amendment claim. The thrust of the claims is that Defendants violated Plaintiffs' equal protection rights by exposing them to conditions that were significantly more dangerous than the conditions to which their "white counterparts" (*i.e.*, Caucasian inmates) at PVSP and ASP were exposed. Plaintiffs reason that because African-Americans are approximately nine times more likely to develop disseminated Valley Fever than are Caucasian individuals, they necessarily were exposed to more dangerous conditions at PVSP and ASP than were Caucasian inmates at the prisons. Plaintiffs claim that Defendants' policies, which include affirmative conduct (*e.g.*, housing African-Americans at the prisons) and omissions (*e.g.*, declining to take preventative measures to reduce the risks of Valley Fever), were applied across the board to all inmates, regardless of their race.

> Specifically, Defendants took no action to mitigate the exposure of the [proposed Plaintiff] Subclasses until 2011 when a temporary sealant was sprayed on soil at PVSP. It was not until 2013, that some dust control devices were installed at PVSP and VSP. Despite all of the knowledge set forth herein, and repeated explicit court orders and directives, Defendants intentionally refuse to exclude the [proposed] Plaintiff Subclasses from incarceration at PVSP and ASP – despite the ability and the resources to do so.

SAC at ¶¶ 142, 150; *see also* SAC at ¶ 155 ("Defendants . . . knowingly incarcerated African-Americans at PVSP and ASP with the knowledge that these individuals were nine times as likely to acquire disseminated cocci than white citizens."); *see also* Doc. 97 at 17.

In other words, Defendants' policies, including housing African-American inmates at PVSP and ASP while not taking adequate measures to protect them from Valley Fever, failed to take into account that Defendants knew African-Americans are more susceptible to contracting Valley Fever and are more prone to developing disseminated Valley Fever than are Caucasians. Plaintiffs therefore assert Defendants intentionally discriminated against them on account of their race because Defendants knew that (1) the risks posed by Valley Fever at PVSP and ASP were greater for African-Americans than Caucasians, and (2) African-Americans at the prisons were being affected by Valley Fever at a higher percentage than the general population. Despite this knowledge, Defendants continued to house African-

Americans at the prisons.

In ruling on Defendants' motion to dismiss Plaintiffs' First Amended Complaint ("the FAC"), the Magistrate Judge found that Plaintiffs' racial discrimination claims stated valid causes of action. *See* Doc. 63 at 7-12; Doc. 68. As the Magistrate Judge found, the thrust of Plaintiffs' racial discrimination claims in the FAC is that Defendants[22] knew that African-Americans housed at PVSP and ASP had a higher risk of contracting disseminated Valley Fever and that African-Americans in fact were contracting the disease at a higher percentage than the general prison population. *See* Doc. 63 at 9. Despite knowledge, Defendants continued to house African-Americans at PVSP and ASP. *Id.*[23] Accordingly, the Magistrate Judge recommended that Defendants' motion to dismiss Plaintiffs' racial discrimination claims be denied, finding that Plaintiffs' racial discrimination claims stated valid causes of action under the Equal Protection Clause[24] and § 1981. *Id.* at 9-12. The Court adopted that recommendation in full. Doc. 68.

Plaintiffs assert the Court is bound to follow those holdings under the law of the case. Doc. 97 at 15. Defendants provide no argument in response.

The law of the case doctrine generally precludes a court from "reconsidering an issue that already has been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997).[25] "For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in the previous disposition." *United States v.*

---

[22] Defendants named in the FAC are the same as those named in the SAC.

[23] Plaintiffs' allegations in the SAC are materially similar.

[24] Plaintiffs' third cause of action is a second equal protection claim in which Plaintiffs allege Defendants had a "custom, policy, and practice of failing and refusing to protect the [proposed] Plaintiff Subclasses." SAC at ¶ 146. This cause of action appears to be couched in terms of a claim brought under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978), which provides a § 1983 claim against municipalities, not individuals such as Defendants. *See Tsao v. Desert Place, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012).

[25] The law of the case doctrine has three exceptions that may permit departure from the law of the case. Those are when: (1) the original decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial. *Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002). No party suggests that any of these exceptions applies here. *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) ("A court may have discretion to depart from the law of the case where: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.").

*Lumia Nation*, 703 F.3d 5780, 1155 (9th Cir. 2014) (emphasis in original). "An argument is rejected by necessary implication when the holding stated or result reached is inconsistent with the argument." *United States v. Jingles*, 702 F.3d 494, 502 (9th Cir. 2012) (quoting *United States v. Jordan*, 429 F.3d 1032, 1035 (11th Cir. 2005)).

In denying Defendants' motion to dismiss the FAC, the Court explicitly found that Plaintiffs' racial discrimination claims stated a valid claim. Doc. 63 at 9. "Issues that a district court determines during pretrial motions become law of the case." *United States v. Phillips*, 367 F.3d 846, 856 (9th Cir. 2004) (citation omitted). Defendants have provided no argument as to why the Court should now depart from its prior conclusion that Plaintiffs' racial discrimination claims state valid causes of action. The Court is bound to follow that conclusion because no exception to the law of the case doctrine applies here. Accordingly, the Court finds that Plaintiffs' racial discrimination claims in the SAC state valid causes of action.[26]

### 2. Whether Defendants Are Entitled to Qualified Immunity from Plaintiffs' Racial Discrimination Claims.

Because the Court concludes Plaintiffs' racial discrimination claims stated valid causes of action against Defendants, the first prong of the qualified immunity analysis—whether Defendants violated Plaintiffs' constitutional rights—is satisfied. *Lal*, 746 F.3d at 1116 (9th Cir. 2014). Next, the Court must determine whether the right(s) at issue in the claims was "clearly established in light of the specific context of the case" at the time of the events in question. *Id.* (citation and quotation marks omitted).

The parties once again frame the constitutional right at issue in starkly different terms. Defendants argue that the right is the "right not to be housed in the Central Valley or otherwise subject to the environmental risk of Valley Fever." Doc. 120 at 8 (emphasis omitted); *see also* Doc. 89-2 at 19 (Defendants arguing that "reasonable officials . . . were entitled to believe that housing Plaintiffs at [PVSP] and [ASP] did not violate Plaintiffs' constitutional rights"). Plaintiffs assert that the right at

---

[26] The Court notes that the Ninth Circuit addressed an equal protection claim premised on Valley Fever exposure in a brief, unpublished memorandum decision in *Samuels v. Ahlin*, 584 Fed. App'x 636, 637 (9th Cir. 2014). Neither that decision nor the district court's underlying decision provide much guidance because the plaintiff-inmate "failed to allege facts showing that he was discriminated against because of his membership in a protected class . . . or that he was treated differently than similarly situation individuals." *Id.*

issue is not the "general right to freedom from risk of exposure to [Valley Fever spores]," but rather the "right of vulnerable populations not to be subjected to (1) elevated and unreasonable risks (2) that are traceable in part to their special, known vulnerabilities and (3) that the defendants fail to take reasonable steps to mitigate" those risks. Doc. 124 at 15-16.

In the Court's view, the general right at issue in Plaintiffs' racial discrimination claims is the right to be free from invidious discrimination based on their race. *See Wolff v. McDonnell*, 418 U.S. 539, 556 (1974) (holding that the Equal Protection Clause protects prisoners from invidious discrimination based on race). Put in the more specific context of this case, it is the right to non-discriminatory administration of prison services. *See Elliot-Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010) (holding that "[t]he right to non-discriminatory administration of protective services is clearly established").

Defendants maintain they are entitled to qualified immunity because "neither the Plaintiffs nor the F&Rs cite a single precedent that even addressed the constitutionality of implementing a race-neutral policy to mitigate a medical issue based on medical criteria, let alone clearly established 'beyond debate' that such a policy would violate the law." Doc. 120 at 9. Simply put, Defendants assert they are entitled to qualified immunity because their conduct was informed by race-neutral recommendations on which they reasonably relied. *See id.* at 9-11.

Defendants essentially ask the Court to find they are entitled to qualified immunity from Plaintiffs' racial discrimination claims because their conduct was not intentionally discriminatory. The Court, however, must assume the truth of Plaintiffs' allegations at this stage of the litigation and, based on those allegations, the Court has found that Plaintiffs have alleged sufficient facts for the Court to reasonably infer that Defendants' conduct was intentionally discriminatory. Although Defendants ultimately may be able to prove their conduct was not animated by racial animus, the Court may not (and cannot) make that determination at this stage in the litigation.

Moreover, "qualified immunity is not a defense in cases involving intentional racial . . . discrimination." *Gutierrez v. Municipal Court of Se. Judicial Dist., Los Angeles Cnty.*, 838 F.2d 1031,

1051 (9th Cir. 1988), *vacated as moot*, 109 S.Ct. 1736 (1989). "If the plaintiff fails to establish that the

discrimination was intentional, the claim fails. If the plaintiff does establish such intent, there can be no

qualified immunity." *Id.* at 1051 n.29. This makes sense given that the right to be free from

discrimination "is so well established and so essential to the preservation of our constitutional order that

all public officials must be charge with knowledge of it," *Flores v. Pierce*, 617 F.2d 1386, 1392 (9th Cir.

1980), and that qualified immunity does not protect the "plainly incompetent" or those who knowingly

violate the law, *al–Kidd*, 131 S.Ct. at 2085. Put more bluntly, assuming Plaintiffs have sufficiently

alleged that Defendants intentionally discriminated against them on the basis of their race, the Court

cannot conceive of circumstances in which Defendants could have reasonably believed their conduct

was lawful. Accordingly, the Court DENIES Defendants' MJP on Plaintiffs' racial discrimination

claims.

## V. CONCLUSION AND ORDER

For the foregoing reasons, the Court ADOPTS in part the F&Rs (Doc. 106). The Court

1. ADOPTS the Magistrate Judge's recommendation to GRANT WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs' claim for injunctive relief;

2. GRANTS WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs' claims against Beard and Brazelton;

3. GRANTS WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs A. Jackson, M. Jackson, and L. Johnson's claims against Hartley;

4. GRANTS WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs Lujan, Taylor, and Belton's claims asserted against Governor Brown;

5. GRANTS WITHOUT LEAVE TO AMEND Defendants' MJP on Plaintiffs' Eighth Amendment claim on the ground Defendants are entitled to qualified immunity from the claim;

6. ADOPTS the Magistrate Judge's recommendation to GRANT WITH LEAVE TO AMEND Defendants' MJP on Plaintiffs' state law negligence claims; and

---

[27] Although the Supreme Court vacated the *Gutierrez* decision as moot, thus rendering it without precedential value, the Ninth Circuit subsequently has cited it favorably, which indicates that its reasoning remains valid. *See, e.g.*, *Barren v. Harrington*, 152 F.3d 1193, 1195 (9th Cir. 1998); *Gonsalves v. Gallegos*, 993 F.2d 882, at *2 (9th Cir. 1993) (unpublished) ("*Gutierrez v. Mun. Court of Southeast Judicial District* . . . (qualified immunity unavailable because 'where the lawfulness of a challenged act is dependent upon the actor's motive or intent, the purpose for which the act was undertaken must be analyzed')").

; DENIES Defendants' MJP in all other respects.

Any further amended complaint shall be filed on or before October 23, 2015.

Two judges of this Court have provided a tremendous amount of judicial resource in resolving Defendants' MJP. The Court expects that counsel for both sides will invest at least as much resource into reading this Order, following its directives, and making wise and prudent decisions when providing an amended pleading, and thereafter in determining whether it is necessary to attack that next pleading. The Court has provided sufficient law for counsel to arrive at a satisfactory pleading that all counsel can understand and not attack. Should the unfortunate circumstance occur that the Court is again called upon to rewrite pleadings, the subsequent Order will be substantially shorter and lighter on research and detail, and most likely won't result in another opportunity to amend.

IT IS SO ORDERED.

Dated:   __September 17, 2015__          ____/s/ Lawrence J. O'Neill__
                                        UNITED STATES DISTRICT JUDGE